Alvin PEARSON, Brenda Curtis, Century 21 Pearson, Inc. Realtors®, an Illinois corporation, Plaintiffs,

v.

James EDGAR and Jim Ryan, Defendants.

No. 86 C 2181.

United States District Court, N.D. Illinois, Eastern Division.

May 14, 1997.

Philip C. Stahl, David E. Schoenfeld, Christopher Raymond Hill, Grippo & Elden, Chicago, IL, for plaintiffs.

Jonathan Clark Green, Illinois Attorney General's Chicago, IL, for defendants.

### MEMORANDUM OPINION

BRIAN BARNETT DUFF, District Judge.

This case comes before this Court for the fourth time. The plaintiffs, Alvin Pearson, Brenda Curtis, and Century 21 Pearson, Inc, originally commenced this action on March 31, 1986, seeking injunctive relief and a declaratory judgment that 720 ILCS 590/1 § 1(d) violates the First and Fourteenth Amendments of the United States Constitution. Following this Court's denial of the plaintiffs' motion for preliminary injunction, this case began its exhaustive appellate process. After two rounds of appeals, each affirming this Court, the case reached the United States Supreme Court, which then remanded it for further consideration in light of *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993). Given this directive, the Court held a bench trial in April 1996 to determine the constitutionality of the Illinois statute. After hearing the evidence and reviewing the parties' submissions, the Court finds that 720 ILCS 590/1 § 1(d) violates the First and Fourteenth Amendments. Below, this Court presents its findings of fact and conclusions of law in accordance with Federal Rule of Civil Procedure 52.

### I. FINDINGS OF FACT

1. Plaintiffs Alvin Pearson("Pearson") and Brenda Curtis ("Curtis") are real estate brokers who work for Century 21 Pearson. Pls.' Ex. 1 ¶ 2, 2 ¶ 2.

2. Century 21 Pearson, Inc. Realtors® ("Century 21 Pearson") is a real estate brokerage business owned and operated by Pearson. *Pls.' Ex.* 1 ¶ 2. Century 21 Pearson serves part of the City of Chicago and its southern suburbs. *Id.*

3. The Defendants are Governor James Edgar and Attorney General Jim Ryan, in their official capacities. This case was originally brought against James R. Thompson, then-Governor of Illinois, Neil F. Hartigan, then-Attorney General of Illinois, Richard M. Daley, then-State's Attorney of Cook County, and the Beverly Area Planning Association ("BAPA"). The Cook County State's Attorney was dismissed, without prejudice in 1988. That same year, the case against BAPA ended after the entry of a consent decree. Governor Edgar and Attorney General Ryan were then substituted for their predecessors in office; they are the only remaining defendants in the case.

4. This case arose from Pearson's prosecution by the Cook County State's Attorney for violating 720 ILCS 590/1 § 1(d) ("the statute"), the statute prohibiting realtors from soliciting an owner to list or sell his home if the owner has provided notice of his desire not to be solicited. A real estate broker with Century 21 Pearson, Mardie Brown, had "cold-called" individuals on South Winchester Avenue to inquire whether the homeowners were considering selling their residence within the next two years and, if not, whether they knew of someone who was considering selling their residence in the next few years. Uncontested Fact ¶ 44. Several Beverly area residents who had signed the BAPA anti-solicitation list, and one who had not, complained about these calls to BAPA. Uncontested Fact ¶ 44. BAPA then contacted the State's Attorney Office and asked that

a prosecution be initiated. Uncontested Fact ¶ 45.

5. Pearson, Brown, and Century 21 Pearson were charged with knowingly violating the anti-solicitation statute. Pearson, Brown, and Century 21 Pearson subsequently stipulated to the facts supporting the charges against them without admitting guilt. Each eventually received a disposition of supervision and a $100 fine. The criminal complaints against Pearson and Century 21 Pearson were subsequently dismissed in July 1988. Uncontested Fact ¶ 47.

6. Pearson, Curtis, and Century 21 Pearson then brought this suit in federal court claiming that the anti-solicitation statute violated their rights to freedom of speech, due process, and equal protection. They sought a preliminary injunction which this Court denied.

7. The Seventh Circuit affirmed the denial of the preliminary injunction in *Curtis v. Thompson*, 840 F.2d 1291 (7th Cir.1988).

8. Following that appeal, the case returned to this Court for a decision on the merits. The parties stipulated to a written record to be used to determine the constitutionality of the statute. Further review of the Seventh Circuit's decision in *Curtis v. Thompson* revealed, however, that *Curtis* established the law of the case and precluded an evidentiary hearing or consideration of additional evidence. Accordingly, this Court entered judgment dismissing the case in July 1989. *Pearson v. Thompson*, 1989 WL 88367 (N.D.Ill. July 26, 1989).

9. The Seventh Circuit affirmed the dismissal of the case in an unpublished opinion. *Pearson v. Thompson*, 1992 WL 25349 (7th Cir. Feb.13, 1992). The plaintiffs then petitioned for a writ of certiori, which the Supreme Court granted. In April 1993, the Supreme Court vacated the decision and remanded the case to the Seventh Circuit for further consideration in light of *City of Cincinnati v. Discovery Network*. *Pearson v. Edgar*, 507 U.S. 1015, 113 S.Ct. 1809, 123 L.Ed.2d 441 (1993).

10. The Seventh Circuit subsequently remanded the case to this Court with instructions to "conduct an evidentiary hearing to allow the parties to create the appropriate record for determining constitutionality of [720 ILCS 590/1 § 1(d) ] under the new standards set out by *Discovery Network*." *Pearson v. Thompson*, 1993 WL 315601 (7th Cir. Aug.12, 1993).

11. Following the remand, this Court held a two day hearing in August 1994 based on the stipulated record.

12. On August 29, 1995, this Court concluded that the 1994 hearing had not provided the parties with an ample opportunity to create the appropriate record. This Court again reviewed the Seventh Circuit's most recent order and determined that it allowed the parties to expand the record beyond the stipulated facts. The parties were then directed to conduct discovery and prepare for trial. *Pearson v. Edgar*, 1995 WL 519748 (N.D.Ill. Aug.30, 1995).

13. This Court held a bench trial on April 15–26, 1996. The plaintiffs presented the following witnesses during the trial: Alvin Pearson; Brenda Curtis; Neal Beaulieu, co-owner of Century 21 Beaulieu and an attorney who defended real estate brokers accused of violating the statute; Frank J. Williams, owner of F.J. Williams Realty and former president of the Chicago Association of Realtors® and the South–Side Chicago Branch of the National Association for the Advancement of Colored People; Dr. Brian J.L. Berry, Professor of Political Economy at the University of Texas; William North, former Executive Vice President and General Counsel for the National Association of Realtors®; and Laurence Stanton the Executive Director of the BAPA. The plaintiffs also designated certain portions from the deposition testimony of Felix Zaczek, the owner of a cooperative mailing franchise; George Part, the Executive Vice President of the South/Southwest Association of Realtors®; Sherlynn Reid, Director of Community Relations for the Village of Oak Park; Joseph Martin, Executive Director of the Housing Coalition of the Southern Suburbs; William Biros, a real estate broker who sells property in the Beverly area; and Clayton Daughenbaugh of the Institute for Community Empowerment.

14. The defendants presented the following witnesses during the trial: Laurence Stanton, and Dr. Calvin Bradford, a private consultant on issues of community reinvestment and development as well as fair housing and lending. The Defendants also designated portions of the depositions of Zaczek, Pat, Reid, Martin, Biros, and Daughenbaugh. The following facts are based on the evidence presented by the plaintiffs and defendants during the trial.

15. The Illinois anti-solicitation statute, 720 ILCS 590/1(d), provides in relevant part:

§ 1. It shall be unlawful for any person or corporation knowingly

(d) To solicit any owner of residential property to sell or list such residential property at any time after such person or corporation has notice that such owner does not desire to sell such residential property. For the purpose of this subsection, notice must be provided as follows:

(1) The notice may be given by the owner personally or by a third party in the owner's name, either in the form of an individual notice or a list, provided it complies with this subsection.

(2) Such notice shall be explicit as to whether each owner on the notice seeks to avoid both solicitation for listing and sale, or only for listing, or only for sale, as well as the period of time for which any avoidance is desired. The notice shall be dated and either of the following shall apply: (A) each owner shall have signed the notice or (B) the person or entity preparing the notice shall provide an accompanying affidavit to the effect that all the names on the notice are, in fact, genuine as to the identity of the persons listed and that such persons have requested not to be solicited as indicated.

(3) The individual notice, or notice in the form of a list with the accompanying affidavit, shall be served personally or by certified or registered mail, return receipt requested.

16. A broker who violates tie statute may be imprisoned for up to one year and fined up to one thousand dollars. 720 ILCS 590/2(a) (1993); 730 ILCS 5/5–8–3(a)(1) (1993); 730 ILCS 5/5–9–1(a)(2) (1997 Supp.). A second conviction provides for a sentence of one to three years and a fine up to ten thousand dollars. 720 ILCS 590/2 (1993); 730 ILCS 5/5–8–1(a)(7) (1997 Supp); 730 ILCS 5/5–9–1(a)(1) (1997 Supp.).

17. A conviction under this statute also requires the Illinois Department of Professional Regulation to revoke the broker's certificate of registration, thereby depriving the broker of his ability to earn a living in his profession. 720 ILCS 590/3 (1993).

18. As real estate brokers, the plaintiffs' incomes depends largely on commissions earned from the sale of property. Uncontested Fact ¶ 2.

19. Brokers may serve as either the listing broker or the cooperating buyer's broker. The listing broker is responsible for listing the property for sale and assists the seller. The cooperating broker for the buyer assists individuals who wish to purchase a home in finding a suitable property. Brokers can earn commissions either from being a cooperating broker for a buyer or the listing broker, since the commission is split between the buyer's broker and the listing broker. The listing broker, however, has the potential to earn the entire commission if he both lists and sells the property. Tr. 188 (Beaulieu).

20. Plaintiffs generally obtain listings of properties through truthful, nondeceptive advertising regarding the local real estate market and services available from the real estate brokerage firm and its affiliated brokers. Listings are also obtained through personal contacts and referrals from former clients. Uncontested Fact ¶ 3.

21. In addition to serving as a listing or buyer's brokers, real estate brokers provide a variety of other services, which include appraisals, mortgage brokerage services, and commercial leasing and sales. Tr. 46–47 (Pearson); 165–167 (Curtis); 255–256 (Williams); 642–643 (North). None of these services involve the selling or listing of residential properties for sale.

22. A significant amount of real estate advertising simply builds goodwill or name recognition and is not intended to induce anyone to list or sell his residence. Tr. 163–164 (Curtis); 249–250, 252–254 (Williams).

23. Most real estate brokers, including plaintiffs, rely on mass mailings, phone calls, and other forms of advertising to build name recognition within a community, to establish contacts with individuals who may wish to use the broker's services to sell or buy a residence, and to advertise their other services. Tr. 144, 147 (Curtis); Tr. 187 (Beaulieu).

24. The plaintiffs' typically rely on direct mail to contact individuals; they also advertise their services through telephone and door-to-door contacts. Tr. 163 (Curtis).

25. These solicitation techniques generate more real estate listings than general advertising through newspaper or yellow page advertisements. Tr. 56, 95, 128 (Pearson); Tr. 643 (North).

26. The anti-solicitation statute therefore inhibits the ability of brokers to obtain listings. Tr. 70 (Pearson); Tr. 263 (Williams).

27. Plaintiffs' solicitations offer homeowners valuable services, even if the latter have no current plans to sell their home. Tr. 642–643 (North). For example, plaintiffs' solicitations offer homeowners free written "market evaluations," which assess the current value of the homeowner's property. Tr. 165–167 (Curtis); Pls.' Ex. 1C. In addition to determining market value prior to listing a property for sale, such information may also be used as an appraisal for use in bankruptcy or divorce proceedings. Tr. 167 (Curtis). Additionally, many homeowners request these "market evaluations" to satisfy their curiosity regarding the current worth of their property. Tr. 165 (Curtis).

28. Plaintiffs' solicitations also provide a service by informing homeowners facing foreclosure that they have an option to sell their home. This benefits the homeowner because a sale prior to foreclosure generally recovers more of the homeowner's equity than at a foreclosure sale. Homeowners facing foreclosure are often unaware of this option prior to receiving information from real estate brokers. Tr. 155–156 (Curtis); Tr. 255 (Williams).

29. Flyers which provide household tips, as well as information on the real estate brokerage firm, are standard real estate marketing techniques, which are used throughout the nation. Tr. 36–39 (Pearson); Tr. 191–195 (Curtis).

30. Examples of such flyers include a bulk mailing providing an "Energy Cost Cutting Tip," advising residents to weather strip and caulk their homes to reduce energy costs, and a flyer providing a Thanksgiving turkey stuffing recipe. Pls.' Ex. 8B, 8C. In addition to providing these household tips, such flyers also allow homeowners to request information about the brokerage firm's services, if they chose to do so. *Id.*

31. Real estate firms which mailed these flyers were prosecuted under the statute. Tr. 192–193 (Beaulieu). After lengthy and costly litigation, the state courts eventually dismissed the criminal complaints. Tr. 209–211, 213 (Beaulieu).

32. These flyers were not used to panic peddle or blockbust.

33. The primary purpose of the statute is to combat panic peddling and blockbusting. Uncontested Fact ¶¶ 17–18; *People v. C. Betts Realtors,* 66 Ill.2d 144, 5 Ill.Dec. 258, 361 N.E.2d 581 (Ill.1977).

34. Blockbusting and panic peddling are real estate practices in which brokers encourage owners to list their homes for sale by exploiting fears of racial change within their neighborhood. In such cases, brokers capitalize upon fears that property values within the neighborhood will plummet as a result of minority entry into the community. *See* Tr. at 825; Uncontested Fact ¶ 17.

35. The speech for which the plaintiffs were prosecuted proposed legitimate commercial transactions and was not deceptive. Uncontested Fact ¶ 49.

36. The conduct for which the plaintiffs' were prosecuted constituted neither panic peddling nor blockbusting. Tr. 69 (Pearson); Uncontested Fact ¶ 48.

37. There is no evidence that standard real estate marketing materials cause rapid

racial change or contribute to panic selling. Tr. 512 (Berry).

38. Panic peddling and blockbusting did occur in Chicago during the 1960s and early 1970s. Tr. 545, 564–565, 568, 576 (Berry); Tr. 808–815 (Bradford).

39. However, blockbusting and panic peddling rarely, if ever, occur in Illinois today. Pls.' Ex. 6 ¶ 5; Daughenbaugh dep. at 129. *See also* Uncontested Fact ¶ 21.

40. There was testimony that some Chicago neighborhoods and suburbs are currently experiencing racial change; however, there was no evidence that any real estate broker is engaging in blockbusting or panic peddling within those areas. Tr. 816–825 (Bradford).

41. Standard real estate solicitation and marketing techniques are neither being used to panic peddle nor contributing to any racial change currently occurring in Chicago neighborhood and suburbs. *See* Tr. 640–642, 644–645 (North).

42. There have been no prosecutions by the Cook County State's Attorney Office for violations of the Illinois anti-solicitation or blockbusting statutes since 1987 or 1988. Pls.' Ex. 32, 34; Uncontested Fact ¶ 20.

43. The record established that blockbusting and panic peddling are not subtle activities. Tr. 642 (North).

44. If real estate brokers engage in blockbusting and panic peddling, their conduct can be directly prosecuted under federal law, 42 U.S.C. § 3604(e), and state law, 720 ILCS 590/1(a)-(c).

45. The statute applies only to real estate solicitations. Uncontested Fact ¶ 13.

46. The statute is not limited to solicitation in or at the home. 720 ILCS 590/1(d).

47. During the bench trial, the defendants produced no evidence in this case that real estate solicitation harms or threatens to harm residential privacy.

48. There was no evidence in this case that plaintiffs, or other real estate brokers, aggressively solicit individuals within a community. Tr. 43–44 (Pearson); Tr. 149 (Curtis).

49. The plaintiffs credibly testified that real estate brokers have nothing to gain by pestering unwilling recipients of their solicitations. Tr. 164–165 (Curtis); Tr. 261–262 (Williams).

50. Realtors rely on similar solicitation techniques as other businesses.

51. The Illinois anti-solicitation statute, while prohibiting solicitation, does not define the term. 720 ILCS 590/1(d).

52. The Cook County State's Attorney's Office maintains no guidelines for prosecuting alleged violations of the anti-solicitation statute. Uncontested Fact ¶ 15; Pls.' Ex. 3B.

53. At the time of the bench trial, communities where anti-solicitation lists were in effect included the Chicago neighborhoods of Ashburn and Beverly.[1] Pls.' Ex. 17, 40. The suburban communities included Calumet City, Country Club Hills, Dolton, Glenwood, Matteson, Oak Park, Park Forest, Richton Park, Riverdale, South Holland, and University Park. Pls.' Ex. 20, 21, 22, 32, 33, 39; Defs.' Ex. 1, 4, 7, 13, 16.

54. The statute permits third parties to give notice in the owner's name. 720 ILCS 590/1. Such notice is usually given en masse through anti-solicitation lists, which may include hundreds or thousands of individual names and addresses. Pls.' Ex. 1A, 22, 66; Defs.' Ex. 1, 4, 6, 14. *See also* Uncontested Fact ¶ 22.

55. Community associations often solicit homeowners to sign their anti-solicitation lists. Tr. 398 (Stanton); Pls.' Ex. 16, 52, 58.

56. Some organizations garner signatures from homeowners by characterizing standard real estate solicitation as creating the threat

---

1. The activities and policies of the BAPA were the focus of much of the testimony and evidence presented during trial. This Court finds that BAPA's policies and practices regarding for sale signs and the multiple listing service do not directly impact the First and Fourteenth Amendment challenges to the anti-solicitation statute. These policies are relevant, however, to the extent that they, in concert with the anti-solicitation list campaign, restrict alternative channels for brokers. This Court accordingly includes findings on these limited issues.

of panic peddling or blockbusting. These campaigns contribute to residents' perceptions of real estate solicitations as threats to their communities. Pls.' Ex. 16, 52; Tr. 496–498 (Berry).

57. There is no evidence that an individual homeowner has ever directly given notice under the statute to a real estate broker. *See* Tr. 64–65 (Pearson); Tr. 207 (Beaulieu).

58. The statute does not require that the lists be organized, if at all, in any systematic way. 720 ILCS 590/1(d); Tr. 202–206 (Beaulieu); Uncontested Fact ¶ 35.

59. Moreover, the statute does not require that anti-solicitation lists be updated to remove the name of individuals who no longer live at the address specified on the list. 720 ILCS 590/1(d).

60. In the past, some community organizations would serve brokers with large lists in random order. Tr. 202–206 (Beaulieu); Pls.' Ex 1A, 66. For example, a list compiled by the Northwest Neighborhood Federation in March 1982 which purported to be organized by street address contained names out of order. Pls.' Ex. 66.

61. Prior to the entry of a consent decree, BAPA intentionally rearranged its anti-solicitation list in order to make it more difficult for brokers to solicit within Beverly. Uncontested Fact ¶ 38.

62. Prior to the consent decree, BAPA never updated its list to delete the names of homeowners who had moved. Uncontested Fact ¶ 39. This served to impede brokers from communicating with new residents in Beverly who might have been interested in the brokers' services.

63. As part of the consent decree, BAPA agreed to compile its list in numerical order by street address and acceded to updating its list annually. These updated lists would serve as notice to brokers of any additional homeowners who did not desire to be solicited. Pls.' Ex. 12.

64. Despite this agreement, BAPA did not update its 1990 list until 1995. By August 1994, at least nine percent of the 1990 BAPA list was out of date. Pls.' Ex. 50, 51; Uncontested Fact ¶ 41.

65. Only BAPA is subject to the consent decree. Pls. Ex. 12. Other community organizations are not under any obligation to provide brokers with clearly organized lists.

66. Anti-solicitation lists in effect at the time of the bench trial were also disorganized. Tr. 152–154 (Curtis); Pls.' Ex. 22. For example, a Village of South Holland list which purported to be organized alphabetically contained names out of order. Pls.' Ex. 22.

67. Such disorganization seriously impedes the ability of brokers to comply with the statute. Tr. 190 (Beaulieu); Tr. 258 (Williams).

68. Previous prosecutions have also involved brokers who have mistakenly violated the anti-solicitation statute. Tr. 203, 212–213 (Beaulieu). *See also People v. Beaulieu Realtors,* 144 Ill.App.3d 580, 98 Ill.Dec. 382, 494 N.E.2d 504 (1986).

69. Therefore, many real estate brokers attempt to protect themselves from prosecution by not soliciting anyone at all in a community with an anti-solicitation list. Tr. 39–40 (Pearson); Tr. 147 (Curtis); Tr. 220–221 (Beaulieu).

70. This deterrent effect prevents brokers from communicating with residents who might be interested in receiving information regarding either their services or other community activities. Tr. 158–159, 170–171 (Curtis); Pls.' Ex. 4 ¶ 12.

71. The fear of prosecution also forces the plaintiffs and other brokers not to advertise in communities with anti-solicitation lists thereby restricting access to information regarding the housing market. Tr. 47–48, 68 (Pearson).

72. Many individuals would benefit from such information since the purchase or sale of a home is often the biggest financial decision that many individuals will make in their lifetimes. *See* Tr. 512 (Berry).

73. The statute also inhibits individuals from receiving information pertinent to their decisions on where to live and raise their families.

74. Since inadvertent mistakes can trigger prosecutions under the statute, real es-

tate brokers avoid communications which cannot be targeted. As a consequence, brokers do not rely on bulk or mass mailings, which are one of the most economical and effective means of reaching a community. *See* Tr. 145 (Curtis); Zaczek dep. 12–13, 52–53, 91–93.

75. The alternative channels of communication open to brokers, such as advertisements in local newspapers or yellow pages, are considerably less effective in reaching homeowners and buyers. Tr. 95, 130 (Pearson). For example, a 1995 survey of home buyers in the Beverly area indicated that only twelve percent of buyers learned about their homes through newspaper advertisements. Tr. 385 (Stanton); Pls.' Ex. 67.

76. In some communities, brokers' channels for communicating with individuals are even more confined. For example, BAPA restricts residential listings on the multiple listing service and discourages the use of "for sale" signs. Thus, brokers find it difficult to obtain listings in the community. Without listings, these brokers have nothing to advertise in the available media such as the *Beverly Review.* Tr. 129 (Pearson); Tr. 177 (Curtis). These practices in concert with an anti-solicitation list block broker access to the community. In doing so they further limit the means through which real estate brokers can contact potential clients.

77. The statute impacts most detrimentally smaller brokerage firms as well as minority-owned ones, since these firms tend to be new businesses with a less-established network.[2] Tr. 144 (Curtis); Tr. 187–188 (Beaulieu); Tr. 266 (Williams). As newer businesses, they need to rely more on direct advertising to obtain business and build name recognition than do older more established brokerage firms within a community. Tr. 73 (Pearson); Tr. 645 (North).

## II. ADDITIONAL FINDINGS OF FACT AND CONCLUSIONS OF LAW

The plaintiffs' present three legal challenges to the statute. First, they contend that the Illinois statute infringes upon their First Amendment right to freedom of speech. Second, they maintain that the statute, both on its face and as applied to the plaintiffs, is unconstitutionally vague in violation of the Due Process Clause. Finally, the plaintiffs claim that the statute, by singling out real estate brokers, violates the Equal Protection Clause of the Fourteenth Amendment. This Court addresses these claims in turn below.

## A. First Amendment Protection of Commercial Speech

Since the plaintiffs' speech clearly proposes a commercial transaction, this Court must consider the constitutional protection accorded such speech. Prior to the 1970s, commercial speech was viewed as outside the protection of the First Amendment. The Supreme Court altered this view with its landmarks rulings in *Bigelow v. Virginia,* 421 U.S. 809, 95 S.Ct. 2222, 44 L.Ed.2d 600 (1975), and *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976), which brought commercial speech within the umbrella of the First Amendment. Commercial speech remained, however, subordinate to noncommercial speech. The Court observed that "commercial speech [enjoys] a limited measure of protection, commensurate with its subordinate position in the scale of First Amendment values, and is subject to modes of regulations that might be impermissible in the realm of noncommercial expression." *Florida Bar v. Went For It, Inc.,* 515 U.S. 618, ——, 115 S.Ct. 2371, 2375, 132 L.Ed.2d 541 (1995) (internal quotations and citations omitted). While the Court has subsequently signalled its heightened scrutiny of complete bans on commercial speech, other commercial speech restrictions must be reviewed under the "intermediate scrutiny" framework established in *Central Hudson Gas & Electric Corp. v. Public Service*

---

**2.** Furthermore, the record establishes that the statute works to the particular detriment of minority brokers and homebuyers. Although not a determining factor in the decision, this Court finds troubling the reality that anti-solicitation lists are compiled only in predominantly white neighborhoods. While the record is incomplete on this matter, this Court strongly believes that community organizations, such as BAPA, primarily use the statute to block minority entry into their communities.

*Comm'n of New York,* 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980).[3] Since the statute in the case at bar does not constitute a blanket prohibition, this Court must apply the *Central Hudson* test to determine the constitutionality of the restriction.

■ The *Central Hudson* test first requires a court to determine whether the commercial speech is truthful and concerns lawful activity. The government may freely regulate illegal and deceptive speech. Legitimate commercial speech may only be restricted, however, if the government satisfies the remaining three prongs of the *Central Hudson* test. Since it is undisputed that the plaintiffs' messages involve legitimate, nondeceptive speech, this Court must apply the remaining *Central Hudson* prongs.

In order to meet its burden under *Central Hudson,* the State must: 1) articulate a "substantial interest" that the regulation serves; 2) demonstrate that the regulation materially and directly advances that interest; and 3) establish that the regulation is "narrowly drawn." *Central Hudson,* 447 U.S. at 564–65, 100 S.Ct. at 2350–51. The State has cleared the first hurdle by articulating two substantial interests which justify the restriction. "Unlike rational basis review, the Central Hudson standard does not permit [the court] to supplant the precise interests put forward by the State with other suppositions." *Edenfield v. Fane,* 507 U.S. 761, 768, 113 S.Ct. 1792, 1798, 123 L.Ed.2d 543 (1993). This Court restricts accordingly its analysis to the two interests advanced by the State: the prevention of blockbusting and the protection of residential privacy.[4] The plaintiffs concede that these are significant interests in the abstract. Given Supreme Court precedent, this Court must agree that the defendants' articulated interests are substantial. *See Florida Bar v. Went For It,* 515 U.S. at ——, 115 S.Ct. at 2376 ("[t]he State's interest in the well-being, tranquility, and privacy of the home is certainly of the highest order in a free and civilized society"); *Edenfield v. Fane,* 507 U.S. at 769, 113 S.Ct. at 1799 (acknowledging privacy as substantial state interest); *Linmark Assoc., Inc. v. Township of Willingboro,* 431 U.S. 85, 94, 97 S.Ct. 1614, 1619, 52 L.Ed.2d 155 (1977) (recognizing the encouragement of "stable, racially integrated housing" as substantial state interest)

■ The defendants fail, however, to meet their burden regarding the final two prongs of the *Central Hudson* test. In order to satisfy the second prong of the test, the State must demonstrate that the statute materially and directly advances these interests. "Mere speculation or conjecture" is insufficient to meet this burden. *Edenfield,* 507 U.S. at 770, 113 S.Ct. at 1799–1800; *see also Ibanez v. Florida Dep't. of Business and Professional Regulation, Bd. of Accountancy,* 512 U.S. 136, 148–49, 114 S.Ct. 2084, 2091–92, 129 L.Ed.2d 118 (1994). Rather, the government must show "that the harms it recites are real and that its restriction will in fact alleviate them to a material degree." *Id.* at 771, 113 S.Ct. at 1800 (citations omitted). The Supreme Court indicated in *Edenfield* that typically the government must present some evidence in order to meet this burden. In that case, the Court rested its decision to invalidate a Florida ban on in-person solicitation by certified public accountants, in part, on the fact that the State had presented "no studies that suggest personal solicitation of prospective business clients by [accountants] creates the dangers of fraud,

3. The Court has recently stated that "[w]hen a State regulates commercial messages to protect consumers from misleading, deceptive, or aggressive sales practices, or requires the disclosure of beneficial consumer information, the purpose of its regulation is consistent with the reasons for according constitutional protection to commercial speech and therefore justifies less than strict review." *44 Liquormart, Inc. v. Rhode Island,* —— U.S. ——, ——, 116 S.Ct. 1495, 1507, 134 L.Ed.2d 711 (1996). The Court distinguished complete prohibitions on truthful commercial speech, noting that "when a State entirely prohibits the dissemination of truthful,

non-misleading commercial messages for reasons unrelated to the preservation of a fair bargaining process, there is far less reason to depart from the rigorous review that the First Amendment generally demands." *Id.*

4. It is inconsequential to this Court's analysis that residential privacy was not the original interest that the statute was enacted to protect. *See Bolger v. Youngs Drug Products Corp.,* 463 U.S. 60, 71, 103 S.Ct. 2875, 2882–83, 77 L.Ed.2d 469 (1983) (noting that the State may articulate new interests which the statute serves).

overreaching, or compromised independence that the Board claims to fear." *Id.* at 771, 113 S.Ct. at 1800. Moreover, "[t]he record [did] not disclose any anecdotal evidence, either from Florida or another State, that validated[d] the Board's suppositions." *Id.* Without any evidence, the State could not demonstrate that the harms it cited were real, let alone that the ban alleviated them. Accordingly, the Court concluded that the State of Florida had failed to satisfy the *Central Hudson* test and that the ban was an unconstitutional restriction on speech.

■ As in *Edenfield,* the defendants have failed to demonstrate that the harms they recite are real. No evidence was introduced that blockbusting or panic peddling currently occur in Illinois. The defendants' expert, Dr. Calvin Bradford, testified primarily regarding the blockbusting and panic peddling practices of the 1960s and early 1970s. While Dr. Bradford did state that some Chicago neighborhoods and suburbs were currently undergoing racial change, he gave *no indication* that these communities were experiencing blockbusting or panic peddling. Moreover, there was no evidence that standard real estate marketing and solicitations techniques, such as those used by the plaintiffs, create the danger of panic peddling or blockbusting.

Rather, the evidence established that blockbusting and panic peddling are not occurring today. Even if such practices recurred, there are less restrictive means to regulate such activities. For example, if a real estate broker attempts to blockbust or panic peddle within a community, such conduct could be prosecuted under either the federal or Illinois statute which directly prohibits this conduct. These statutes present alternative, and less restrictive, means for preventing blockbusting and panic peddling. While this Court acknowledges that the *Central Hudson* framework does not require that the state implement the least restrictive regulation, it does mandate that any restriction on commercial speech be "narrowly drawn" and "no more extensive than reasonably necessary to further [the state's] substantial interests." *Bd. of Trustees of State Univ. of New York v. Fox,* 492 U.S. 469, 477, 109 S.Ct. 3028, 3033, 106 L.Ed.2d 388 (1989).

The evidence at trial established that fear of prosecution among brokers effectively converts the anti-solicitation statute into a complete ban on real estate solicitation within many communities. A near ban on real estate solicitation to alleviate a virtually non-existent harm cannot be defined as a "narrowly drawn" restriction. *See New York State Ass'n of Realtors, Inc. v. Shaffer,* 27 F.3d 834, 842–45 (2d Cir.1994) (concluding that New York ban on real estate solicitation in certain geographic areas did not present a reasonable fit with anti-blockbusting interest); *Greater Baltimore Bd. of Realtors, Inc. v. Baltimore. County, Maryland,* 752 F.Supp. 193 (D.Md.1990) (finding that, in light of the fact that blockbusting no longer occurred in county, ban on real estate solicitation was not narrowly tailored restriction).

While this Court finds blockbusting and panic peddling reprehensible, it cannot permit the State broadly to regulate truthful, legitimate commercial speech in order to deter the occasional blockbuster. The State currently possesses various alternative means to prosecute blockbusting or panic peddling, should it occur. Perhaps as importantly, these other statutes do not restrict any truthful, legitimate speech. Having failed the final two prongs of the *Central Hudson* test, the State's interest in the prevention of blockbusting and panic peddling, although substantial in the abstract, is insufficient to support the statute.

This, however, does not end the analysis. The statute may be upheld if the State's second interest, residential privacy, satisfies the final prongs of the *Central Hudson* test. Unfortunately for the defendants' purposes, the residential privacy interest also fails this test. As previously discussed, residential privacy undoubtedly presents a substantial state interest. This, however, is *not* sufficient. The defendants must establish that the statute materially advances residential privacy and provides a reasonable fit with that interest. The defendants attempt to satisfy these prongs of *Central Hudson* by arguing that it is "common sense" that the anti-solicitation statute protects residential privacy since it decreases the number of intrusions into the home. This statement

might be sufficient if the State had enacted a content-neutral restriction on solicitation.[5] In this case however, the State did not regulate all solicitation; it distinguished real estate solicitation from other forms of solicitation.

In order to single out one type of solicitation, the State must relate its articulated interest in residential privacy to the distinction drawn by the statute. The Supreme Court addressed this issue in *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993), a case involving a city ordinance prohibiting the distribution of "commercial handbills" on public property. The ordinance at issue in *Discovery Network* barred the plaintiffs from distributing a free magazine, which advertised real estate for sale and provided information about other real estate matters, in freestanding newsracks located on public property. Noncommercial publications, such as newspapers, were not similarly restricted.

The City attempted to justify its ban by asserting an interest in the safety and aesthetics of its streets and sidewalks. Specifically, the City argued that any decrease in the number of newsracks resulted in a increase in the safety and attractiveness of the city. The Court accepted the basic validity of this argument "but consider[ed] it an insufficient justification for the discrimination against respondent's use of newsracks that are no more harmful than the permitted newsracks, and have only a minimal impact on the overall number of newsracks on the city's sidewalks." *Discovery Network*, 507 U.S. at 418, 113 S.Ct. at 1511.

Applying this reasoning to the case at bar, residential privacy provides insufficient justification for the statute's distinction between real estate solicitation and other forms of solicitation. Solicitations, whether by realtors or other professionals, are equally intrusive and bothersome. Yet, the statute singles out real estate solicitation as the threat to residential privacy, even though real estate solicitation comprises only a small percentage of the commercial messages which enter our homes daily.

Even without any solicitations by real estate brokers, homeowners must continue to sift through mass mailings and answer numerous phone calls. These intrusions and interruptions are generally viewed simply as a cost of life in modern society. Homeowners who are not interested in such solicitations routinely either discard these materials or terminate the telephone calls or door-to-door contacts. Certainly, homeowners can do the same when confronted with real estate solicitation. The Supreme Court has observed that "the short, though regular, journey from mail box to trash can ... is an acceptable burden, at least so far as the Constitution is concerned." *Bolger*, 463 U.S. at 72, 103 S.Ct. at 2883 (citations omitted). Thus, the defendants have failed to demonstrate how real estate solicitation is any more a "threat" to residential privacy than other forms of commercial speech which enter the home wholly unaffected by the statute.

At best, the statute, which effectively restricts much of the realtors' speech, only marginally protects residential privacy. The statute, therefore, restrains too much speech for too incremental a benefit.[6] It is impor-

---

5. The State inexplicably argues that the statute creates a content neutral time, place, and manner restriction. They cite in support *Bland v. Fessler*, 79 F.3d 942 (9th Cir.1996), *superseded by* 88 F.3d 729, and *Van Bergen v. State of Minnesota*, 59 F.3d 1541 (8th Cir.1995), which upheld content neutral statutes regulating solicitations through automatic dialing and announcing devices. In those cases, the restriction regulated all solicitations using these automatic devices, regardless of the content of the message. In contrast, the statute in the case at bar restricts only real estate solicitation. In this case, the content triggers the restriction. Moreover, the statute has been viewed as a content-based restriction throughout this case's history. *See Cur-*

*tis v. Thompson*, 840 F.2d at 1297. Accordingly, the defendants' argument cannot be credited.

6. This Court notes that solicitation, as a form of speech, serves several valuable functions.

In the commercial context, solicitation may have considerable value. Unlike many other forms of commercial expression, solicitation allows direct and spontaneous communication between buyer and seller. A seller has a strong financial incentive to educate the market and stimulate demand for his product or service, so solicitation produces more personal interchange between buyer and seller than would occur only if buyers were permitted to initiate contact. Personal interchange enables

tant to emphasize here that the statute is not limited to solicitation at home. Rather, the statute apparently criminalizes any further solicitation of those individuals anywhere. Moreover, the statute as applied prohibits all real estate communication, not only solicitation. For example, the statute as applied brings within its sweep simple goodwill advertising. Such a broad restriction cannot constitute a reasonable fit with a marginal residential privacy interest.

None of this is to say that residential privacy is a trivial concern. Certainly, the State can act to protect residential privacy. The problem is that the State in this case has not established how real estate solicitation uniquely threatens the home. The defendants have completely failed to offer evidence that real estate solicitation presents a threat to residential privacy. No evidence was introduced regarding the frequency of real estate solicitation or the effect of these solicitations. Moreover, the defendants did not even present anecdotal evidence from homeowners that real estate solicitations intrude upon their privacy. Cf. Edenfield, 507 U.S. at 771, 113 S.Ct. at 1800–01 (invalidating ban on CPA solicitation because defendant presented no evidence, not even anecdotal, that ban advanced its interests) with Florida Bar, 515 U.S. at ——, 115 S.Ct. at 2377 (commenting approvingly upon the "breadth and detail" of the anecdotal evidence introduced by the Florida Bar to justify its thirty day ban on attorney solicitation). The defendants in this case are left with nothing other than the bare assertion that the statute protects residential privacy.

If the mere invocation of privacy is sufficient to withstand constitutional scrutiny, any regulation which even minimally protects residential privacy would be beyond the court's review. While this Court acknowledges the strength of interest in residential privacy, it cannot countenance this result. The State cannot simply invoke residential privacy, without more, and expect the statute to satisfy the Central Hudson test. As the

Supreme Court clearly stated in Discovery Network, the First Amendment requires that the State link its interest and the distinction drawn by the statute, a burden which the defendants have failed to satisfy in this case.

In reaching this conclusion, this Court acknowledges that residential privacy provided sufficient justification for the restrictions on commercial speech in both Rowan v. United States Post Office Dept., 397 U.S. 728, 90 S.Ct. 1484, 25 L.Ed.2d 736 (1970), and in Florida Bar. These cases are distinguishable, however, as the government established an adequate link between its privacy interest and the speech restriction. In Rowan, the Supreme Court upheld a federal statute that permitted the post office, upon the request of an individual, to direct the sender to refrain from further mailings to that individual. The statute thereby allowed an individual to stop delivery of any sexually provocative mailings to his home. Once the sender received notice, he was obligated to delete immediately the names of those individuals from his mailing list. Thus, the statute in Rowan superficially resembles the one in the case at bar. Yet, the offensiveness of the content of the mailings dramatically differ. Unlike standard real estate solicitation materials, any offense resulting from the exposure to sexually explicit or provocative materials cannot be erased by a brief journey to the trash can. The harm results from the mere viewing of these materials.

Similarly, the receipt of the solicitation itself created the harm in Florida Bar. In that case, the Court upheld a ban on direct mail to solicit personal injury or wrongful death clients within thirty days of an accident in order to protect "the personal privacy and tranquility of [Florida's] citizens." 515 U.S. at ——, 115 S.Ct. at 2379. Specifically, the Court observed that "[t]he harm posited by the Bar is as much a function of the simple receipt of targeted solicitations within days of accidents as it is a function of the letters' contents." Id. The Court continued

---

a potential buyer to meet and evaluate the person offering the product or service and allows the seller to direct his proposals toward those consumers who he has reason to believe would be most interested in what he has to

sell. For the buyer, it provides an opportunity to explore in detail the way in which a particular product or service compares to its alternatives in the market.

Edenfield, 507 U.S. at 766, 113 S.Ct. at 1797–98.

"[t]he harm targeted by the Florida Bar cannot be eliminated by a brief journey to the trash can. The purpose of the 30–day targeted direct mail ban is to forestall the outrage and irritation with the state licensed legal profession that the practice of direct solicitation only days after accidents has engendered." *Id.* Once again, the receipt of the material resulted in the offense. In both *Rowan* and *Florida Bar,* the mailings themselves were so offensive that the harm could not be alleviated by merely discarding the material. Thus in both these cases, the restricted speech had the ability uniquely to intrude upon the individual and disrupt the privacy of the home.[7]

In contrast, the content of real estate solicitation does not have the inherent potential to offend or harm. While perhaps an annoyance, any unwanted solicitation can simply be discarded and any contact may be terminated. The mere inconveniences created by real estate solicitations cannot outweigh the value of the speech. Furthermore, the State's interests could have been achieved through less restrictive means. For example, legislation has been enacted in Illinois which prohibits telephone solicitation during certain hours. *See* 815 ILCS 413/15 (1997 Supp.). Such a statute furthers the State's interest in residential privacy without targeting particular speech. As this statute demonstrates, the State had less restrictive alternatives open to it. Rather than choose one, the State elected to single out real estate solicitation as the threat to residential privacy. This it may not do without establishing a

link between its residential privacy interest and the distinction drawn by the statute. As previously discussed, the defendants have failed to do so.

Furthermore, the defendants cannot satisfy the final prong of the *Central Hudson* test. The evidence clearly establishes that brokers lack alternative channels of communication. While the statute's language only prohibits brokers from contacting homeowners on the anti-solicitation list, the statute as applied blocks all solicitations and communications to a community because brokers, including the plaintiffs, fear prosecution under the statute. It is true that the brokers still have available general media advertising, such as newspapers and the yellow pages. These channels, however, are more costly and less effective than methods prohibited by the statute. By blocking the most productive methods of communication for brokers, the statute fails to leave open adequate alternative channels of communication. The defendants' residential privacy interest completely fails, therefore, to satisfy the burdens established by *Discovery Network* and *Central Hudson.*

Thus, the defendants have failed to satisfy the final two prongs of the *Central Hudson* framework. Specifically, the defendants have completely failed to demonstrate that the Statute directly and materially advances either the anti-blockbusting or residential privacy interests. In addition, they have not demonstrated that the statute presents a "reasonable fit" with those State interests.

---

**7.** Moreover, this Court observes that the vulnerability of the audience presented another substantial consideration in these cases. In *Rowan,* the statute served to protect impressionable minors from exposure to sexually explicit materials; in *Florida Bar,* the regulation worked to protect recent accident victims along with their families. The recent Illinois Supreme Court opinion in *Desnick v. Dept. of Professional Regulation,* 171 Ill.2d 510, 216 Ill.Dec. 789, 665 N.E.2d 1346 (Ill.1996), *cert. denied,* — U.S. ——, 117 S.Ct. 390, 136 L.Ed.2d 306 (1996), is similar in this respect. The statute at issue in *Desnick* prohibited licensed physicians from soliciting professional patronage. The *Desnick* court rested it decision to uphold the statute, in part, on the particular vulnerabilities of elderly Medicare recipients. In justifying its restriction, the State maintained that the statute served to

protect residential privacy and prevent fraud and overreaching by physicians. The Court found these interests sufficient to satisfy the *Central Hudson* test. Specifically, the court stated:

> [T]he audience which receives physicians solicitations, the medical public composed of potential clients, have peculiar susceptibilities and vulnerabilities because of their needs and desires to be healthy. In the case of physician solicitation, as opposed to other professional solicitations, such as attorneys or CPA's, the compromise of professional judgment is potentially more injurious.

171 Ill.2d at 535, 216 Ill.Dec. 789, 665 N.E.2d at 1360. Thus, in *Rowan, Florida Bar* and *Desnick,* the statutes served to protect groups of individuals whose privacy was uniquely threatened by the prohibited speech.

Given the fact that this case was remanded for reconsideration in light of the new standards set out by *Discovery Network,* the defendants failure to establish the requisite link between its interests and the distinction drawn by the statute is even more glaring. In sum, the defendants have not satisfied their burden under the *Central Hudson* test. Accordingly, this Court concludes that the statute unconstitutionally restricts the plaintiffs' freedom of speech.

### B. Vagueness

 The plaintiffs also challenge the statute on due process grounds. Specifically, they maintain that the statute's failure to define "solicitation" and to specify how lists be effectively organized renders the statute unconstitutionally vague. "A statute is fatally vague only when it exposes a potential actor to some risk or detriment without giving him fair warning of the nature of the proscribed conduct." *Rowan,* 397 U.S. at 740, 90 S.Ct. at 1492. In applying this standard, this Court also recognizes that "[s]tricter standards of permissible statutory vagueness may be applied to a statute having a potentially inhibiting effect on speech." *Hynes v. Mayor of Oradell,* 425 U.S. 610, 620, 96 S.Ct. 1755, 1760, 48 L.Ed.2d 243 (1976) (citations omitted).

The Supreme Court has identified three problems created by vague laws. First, they "may trap the innocent by not providing fair warning." *Grayned v. Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 2299, 33 L.Ed.2d 222 (1972). Second, "a vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis...." *Id.* at 108–09, 92 S.Ct. at 2299. Finally, "where a vague statute abuts upon sensitive areas of basic First Amendment freedoms, it operates to inhibit the exercise of (those) freedoms." *Id.* at 109, 92 S.Ct. at 2299 (citations omitted). In other words, "[u]ncertain meanings inevitably lead citizens to 'steer far wider of the unlawful zone' ... than if the boundaries of the forbidden areas were clearly marked." *Id.* (citations omitted).

 The plaintiffs argue that the statute's deficiencies create the "vices" outlined in *Grayned.* After conducting the bench trial and reviewing the full record, this Court must agree. By leaving "solicit," the central term, undefined, the statute forces real estate brokers to "necessarily guess at its meaning." It should be emphasized that a great deal of real estate advertising is not intended to induce anyone to list or sell his residence. Advertising materials such as new neighbor announcements, recipes, or tulip bulbs with a message attached are simply intended to build goodwill and name recognition.[8] Yet such advertising is apparently not beyond the reach of the statute. In the past, advertisements with turkey stuffing recipes and energy saving tips have been prosecuted under the statute. Although these criminal complaints were eventually dismissed, the lack of statutory and prosecutorial guidelines allows for the possibility that similar materials could still be prosecuted under the statute. Moreover, the statute's language is so undefined that it could even encompass a broker on public property handing out a business card or distributing a flyer to a homeowner on an anti-solicitation list. As these example demonstrate, realtors remain unclear regarding the statute's scope.

The uncertainty created by the statute necessarily "chills" speech. Brokers who violate the statute expose themselves to criminal penalties, attorneys fees, litigation costs, and the loss of their licenses. Understandably, the potential risk of prosecution causes brokers to "steer far wider of the unlawful zone" by choosing not to communicate in any way with anyone in Beverly and other communities with anti-solicitation lists. A statute, such as this one, that fails to define its

---

8. Other forms of advertising could also fall within the scope of the statute. For example, real estate brokers often increase goodwill by sponsoring neighborhood teams, by participating in charitable fundraising or other community service activities, and by contacting individuals in the community to encourage them to help with civic activities. Since the statute has previously been interpreted to apply to materials that do little more than list the realtor's name, such innocuous activities as sponsoring neighborhood teams could also be viewed as indirect solicitation and be prosecuted accordingly.

prohibitions and thereby traps the innocent necessarily violates due process.

The statute's notice provisions also offend due process. The statute fails to require that anti-solicitation lists be organized in any particular manner so as to ensure brokers receive clear notice as to whom they may not "solicit." The record reveals that this deficiency has allowed community associations to serve brokers with lists which are randomly organized. Even when lists are not intentionally scrambled, they often contain subtle disorganization which increases the likelihood that brokers will inadvertently violate the statute. Once again, fear of prosecution causes brokers to "steer far wider" of the prohibited solicitations by not communicating at all with individuals in communities with anti-solicitation lists.

This fear is justifiable because in the past community organizations like BAPA have aggressively petitioned prosecutors to prosecute even unintentional errors. These prosecutions result from the fact that these community associations distribute lists that often contain disorganization, whether inadvertent or not, which may cause brokers mistakenly to solicit individuals on the list. These associations, which themselves served brokers with an inadequate list, then turn around and insist that these brokers be prosecuted for these inadvertent violations. Thus, the lack of specificity in the notice provision grants community associations too much control of the process. In doing so, the brokers' speech is impermissibly chilled.

The statute's defects are particularly intolerable in light of the criminal penalties authorized by the statute. See, e.g., Winters v. New York, 333 U.S. 507, 515, 68 S.Ct. 665, 670, 92 L.Ed. 840 (1948) (requiring higher "standard of certainty" for statutes imposing criminal sanctions rather than civil penalties). An individual must be aware of the specific conduct which could subject him to criminal sanctions. Thus, the statute's failure to define the prohibited conduct with appropriate certainty renders its unconstitutional.

In response to the plaintiffs' arguments, the defendants simply state that the Seventh Circuit has twice rejected the vagueness claim in cases involving anti-solicitation ordinances. Specifically, they cite to Curtis v. Thompson, 840 F.2d 1291 (7th Cir.1988), and South–Suburban Housing Center v. Greater South Suburban Bd. of Realtors, 935 F.2d 868 (7th Cir.1991), as binding precedent on this Court. The defendants, however, overstate their case.

First, the Curtis v. Thompson decision has been vacated. It is, therefore, no longer the law of this case. Regardless, the Seventh Circuit's decision would not be binding on this Court since they were reached when this case was at the preliminary injunction stage. See Univ. of Texas v. Camenisch, 451 U.S. 390, 395, 101 S.Ct. 1830, 1834, 68 L.Ed.2d 175 (1981) (findings of fact and conclusions of law made during decision on preliminary injunction not binding at trial on the merits); Charles A. Wright, Arthur R. Miller & Mary Kay Kane, 11A Federal Practice & Procedure: Civil 2d § 2941 at 33 ("in deciding whether to grant permanent injunctive relief, a trial court is bound neither by its own decision respecting preliminary injunctive relief, not by that of the appellate court"). Since the appellate court considered the issue on an incomplete record, its brief treatment of the vagueness issue in a footnote has minimal relevance.

The defendants' citation to South–Suburban is equally unpersuasive since that decision is readily distinguishable. For example, the ordinance at issue in South–Suburban explicitly included a definition of "solicit" or "solicitation." As a result, the South–Suburban ordinance clearly applied to goodwill advertisements and communications promoting other services provided by real estate brokerages. Thus, an advertisement offering free appraisals or seminars would have undoubtedly fallen within the scope of the South–Suburban statute. Whether such advertisements are within the reach of the statute in the case at bar remains uncertain. Moreover, the South–Suburban ordinance was explicitly limited to contacts at "the dwelling." The statute in the case at bar lacks similar constraints. Without restricting the statute to communications at the residence, the Pearson statute may even encompass the simple act of giving a business card at a public gathering, a train station

gate, or any other public forum. As these examples demonstrate, the greater specificity and clarity of the language of the *South–Suburban* ordinance differentiates it from the case at bar and renders the *South–Suburban* holding inapplicable.[9]

In short, the defendants arguments are completely unavailing. This Court has now had the benefit of a full trial on the merits and has directly heard the evidence; accordingly, it is in the best position to determine the effects of the statute as applied. Based on the evidence presented, this Court finds that the Illinois anti-solicitation statute as applied violates the Due Process Clause.

### C. Equal Protection

■ Since the statute impermissibly infringes upon the plaintiffs' First Amendment rights, this Court need not address their final claim, but notes that the statute would also violate the Equal Protection Clause.[10]

### III. CONCLUSION

This Court finds that 720 ILCS 590/1 § 1(d) violates the First and Fourteenth Amendments of the United States Constitution. Accordingly, this Court enjoins the defendants and their agents from enforcing 720 ILCS 590/1 § 1(d).

---

**9.** It should also be noted that *South–Suburban* relied heavily on *Curtis,* which has been subsequently vacated.

**10.** Courts review equal protection claims under different standards, depending on the type of statutory classification. "[A] statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against an equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Federal Communications Comm'n v. Beach Communications, Inc.,* 508

U.S. 307, 314, 113 S.Ct. 2096, 2101, 124 L.Ed.2d 211 (1993). However, whenever a state law infringes a constitutionally protected right, a court must "undertake intensified equal protection scrutiny of that law." *Attorney General of New York v. Soto–Lopez,* 476 U.S. 898, 904, 106 S.Ct. 2317, 2321, 90 L.Ed.2d 899 (1986). This is just such a case. Consequently in order to withstand the equal protection challenge, the State must come forward with a compelling justification. As discussed in this opinion, the defendants have failed to do so.