**MAINSTREAM MARKETING SERVICES, INC., a Colorado corporation; TMG Marketing, Inc., a Colorado corporation; and American Teleservices Association, Plaintiffs,**

v.

**FEDERAL TRADE COMMISSION**
**Defendant**

No. CIV.A.03–N–184 (MJW).

United States District Court,
D. Colorado.

Sept. 29, 2003.

Robert Corn–Revere, Ronald G. London, Davis Wright Tremaine, LLP, Washington, D.C., Sean R. Gallagher, Marianne N. Hallinan, Hogan & Hartson, Denver, CO, for Plaintiffs.

Lawrence DeMille–Wagman, Federal Trade Commission, Office of the General Counsel, Room H–582, Washington, DC, for Defendants.

## ORDER DENYING STAY
## OF JUDGMENT

NOTTINGHAM, District Judge.

This matter is before the court on "Defendant Federal Trade Commission's Motion for an Emergency Stay Pending Appeal," filed September 26, 2003. The motion asks this court to stay its order and judgment enjoining the FTC from enforcing its amended Rules (issued in December 2002) establishing and implementing a national do-not-call registry applicable to commercial telemarketers on October 1, 2003. *See* Mem. Op. & Order (D.Colo. Sept. 25, 2003) (hereinafter abbreviated as "Order"). The FTC simultaneously filed a Notice of Appeal from the Order and judgment. Procedurally, therefore, the matter is controlled by rule 62(c) of the Federal Rules of Civil Procedure, which provides, in pertinent part, as follows:

> When an appeal is taken from [a] … final judgment granting … an injunction, the court in its discretion may suspend … [or] modify … an injunction during the pendency of the appeal upon such terms as to bond or otherwise as it considers proper for the security of the rights of the adverse party.

Since an agency of the United States has taken this appeal, however, "no bond, obligation, or other security shall be required from the appellant." Fed.R.Civ.P. 62(e).

In order to obtain a stay of an injunction pursuant to rule 62(c), the FTC, as the applicant, must persuade the court on the following issues:

> (1) whether the stay applicant has made a strong showing that [it] is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

*Hilton v. Braunskill,* 481 U.S. 770, 776–77, 107 S.Ct. 2113, 95 L.Ed.2d 724 (1987); *McClendon v. City of Albuquerque,* 79 F.3d 1014, 1020–1021 (10th Cir.1996) (citing standard for preliminary injunction as applicable in evaluating motion to stay pending appeal); *Reserve Mining Co. v. United States,* 498 F.2d 1073, 1077 (8th Cir.1974). The court will momentarily address each issue, although not in the numerical order enumerated in *Hilton.*

■ As a preliminary matter, it is pertinent to note that the purpose of a stay is to preserve the status quo pending appeal. *McClendon v. City of Albuquerque,* 79 F.3d 1014, 1020–1021 (10th Cir.1996) (citing standard for preliminary injunction as applicable in evaluating motion to stay pending appeal). There are three types of stays that are generally disfavored: (1) those that afford the moving party substantially all the relief it might recover after appeal on the merits, (2) those that disturb the status quo, and (3) those that are mandatory as opposed to prohibitory. *Prairie Band of Potawatomi Indians v. Pierce,* 253 F.3d 1234, 1247 n. 4 (10th Cir.2001) (applying standard to issuance of preliminary injunction). These types of disfavored stays should not be granted unless the four factors weigh heavily and compellingly in favor of the stay. *Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.,* 269 F.3d 1149, 1154–55 (10th Cir.2001) (applying standard to issuance of preliminary injunction).

Here, the proposed stay would (1) afford the FTC all of the relief it would recover after appeal, (2) disturb the status quo, and (3) mandate that telemarketers comply with the do-not-call registry. If the Order is stayed, the FTC do-not-call registry will go into effect on October 1, 2003, and require telemarketers to pay fees for access to the registry. Telemarketers will be prohibited from calling telephone numbers on the list, which may result in signif-

icant lay offs of employees in the industry. This result gives the FTC all the relief it seeks on appeal. Additionally, this result disturbs the status quo and is mandatory because it requires telemarketers to abide by new rules that add significant regulatory burdens to the practice of telemarketing. Accordingly, the court concludes that the FTC must show that the four factors weigh heavily in favor of a stay of the Order pending appeal.

## 1. WOULD A STAY OF THE INJUNCTION SUBSTANTIALLY INJURE OTHER PARTIES INTERESTED IN THE PROCEEDING?

■ If the injunction is stayed and the FTC implements the do-not-call registry, as scheduled, on October 1, 2003, plaintiffs and other similarly-situated commercial telemarketers will effectively be prohibited from calling any number appearing on the registry. Plaintiffs identify two categories of injury which this prohibition will entail. First, it indisputably curtails their first amendment freedom to engage in commercial speech. This circumstance, standing alone, constitutes substantial and irreparable injury. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), *quoting New York Times Co. v. United States,* 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971); *ACLU v. Johnson,* 194 F.3d 1149, 1163 (10th Cir.1999); *Gay Lesbian Bisexual Alliance v. Sessions,* 917 F.Supp. 1558, 1563 (M.D.Ala.1996).

The court must also consider a second category of injury alleged by plaintiffs.

They contend that they and their employees will meet with concrete, significant economic harm if the court stays its injunction and allows the FTC to effect the do-not-call registry. Charitable groups seeking exemption from the do-not-call registry submitted opinion proof to the FTC that their potential donor pool would be reduced by forty to fifty percent if the registry applied to them. 68 Fed.Reg. 4634. This court, in its order of September 25, 2003, accepted an *estimate* that forty to sixty percent of telemarketing calls would be affected by the do-not-call registry. Mem. Op. & Ord., slip op. at 7, n.1. It is reasonable to believe that reductions of this magnitude would probably cause a corresponding loss of business to the industry and loss of jobs held by persons currently occupied in making the calls. Such monetary loss will never be remedied by an award of money damages, because the FTC cannot be ordered to post a bond, and plaintiffs' chances of prevailing in a damages lawsuit against the FTC for violating their constitutional rights appear minuscule, at best.

Although plaintiffs purport to quantify the loss by claiming that two million jobs will be lost, the court finds nothing in the record which justifies this specific inference. The court, however, must also evaluate plaintiffs' contention against what the FTC has offered in response—nothing. More importantly, the FTC cannot gainsay the general proposition that these plaintiffs, their employees, and other commercial telemarketers will suffer substantial economic injury if the FTC implements the do-not-call list, because it cannot square such a denial with its current[1] claim that

1. The FTC's estimate concerning the number of telemarketing calls which would be curtailed by the do-not-call list has crescendoed through the course of this lawsuit and taken on a life of its own with no reference to the factual record. The *current* eighty-percent estimate appears in the FTC's brief supporting its motion to stay. It appears that the estimate is an amalgam derived by assuming that the do-not-call registry would be applied to entities covered both by the Federal Communications Commission and by the FTC. There is nothing whatsoever in the administrative record or the record before this court, beyond

the registry will curtail eighty percent of unwanted telemarketing calls currently received by consumers. A preponderance of the evidence before the court shows that these plaintiffs, other similarly-situated commercial telemarketers, and persons employed by them will likely suffer devastating layoffs and other economic loss if the FTC implements the amended Rules as scheduled. There is no reason on this record to infer that employees can mitigate this loss by going to work for the charitable organizations and other groups exempted from the amended Rules. Moreover, because of the degree and nature of the probable injury, it will be difficult for plaintiffs to re-establish the *status quo ante* if the court allows the amended Rules to take effect, and appellate courts ultimately uphold the substance of this court's ruling, however inconceivable this outcome might be to the FTC and its supporters. It is unlikely, in such an event, that commercial telemarketers and their employees could simply re-group, dust themselves off, and proceed as they were before October 1, 2003.

## 2. WILL THE FTC SUFFER IRREPARABLE INJURY IF THE COURT WERE TO DENY THE MOTION TO STAY THE INJUNCTION?

■ The court concludes that the FTC itself will suffer no injury if the court refuses to stay its injunction, and the FTC does not argue to the contrary. Instead, it points to the probability that, if it is enjoined from implementing the registry, plaintiffs and others will continue to invade the residential privacy of the millions of persons who have indicated a preference for protecting that privacy by placing their numbers on the do-not-call registry. It is not clear to the court whether this question should be taken up here or in its consideration of where the public interest lies. Finding no helpful case law, the court will consider it here. The court has already stated, in the Order filed September 25, 2003, that "[t]he government's interest in protecting the well-being, tranquility, and privacy of the home is of the highest order in a free and civilized society." Weighing that interest and comparing it to the substantial and irreparable injury which plaintiffs will suffer if the court's injunction were stayed requires the court to determine and characterize the intrusion on residential privacy at issue in this case.

The intrusion upon residential privacy at issue here is the ringing of a telephone. That ringing may be more frequent than the consumer would like. It may come at times which are inconvenient. It may be disruptive. Unlike junk mail or electronic spam, it cannot be dealt with at a time chosen by the recipient. It is invariably unwanted and adds to the stress of daily life. It is difficult to conceive, however, how it does economic damage or inflicts physical injury. The intrusion on residential privacy here is properly regarded as severe, vexatious annoyance and inconvenience—nothing more and nothing less.

It is also important that there are ways of limiting the intrusion even if there is delay in implementing the federal registry while the issues are on appellate review. The parties agree that, as of August 2002, twenty-seven states had no-call lists similar to the registry proposed by the FTC. *See* 68 Fed.Reg. 4630. While this may be no comfort to persons in states without such regulations, there is no basis to believe that existing system of regulation will collapse while the issues are being resolved by appellate courts.

Similarly, all other telemarketing rules promulgated by the FTC remain in effect,

the FTC's ipse dixit, to support this amalgam.

The court thus rejects it.

including the company-specific do-not-call rules. As the FTC has succinctly stated on its home page[2] *(http://www.ftc.gov):*

> * Consumers who don't want to receive telemarketing calls can limit them by telling companies to put their number on the company's do not call list. Write down the name of the company and the date that you asked to be put on its do not call list. You should not receive further calls from that company. This provision of the Telemarketing Sales Rule is still in force (as are all non-do-call [sic] provisions of the Rule). The FTC and its state partners are committed to enforcing the company-specific provisions of the Rule.
>
> * The company-specific do not call rules apply to all telemarketing calls.

Finally, if the FTC's suggestions are unavailing, the annoyance and inconvenience of this telephonic intrusion can be reciprocated or countered by a range of perfectly-legal actions best characterized under the rubric "self-help." These actions, many of which should be so obvious as to require no enumeration, are limited largely by the recipient's imagination and the degree of civility or courtesy by which with which any recipient feels constrained (which, the court has reason to believe, may not be much). Undoubtedly, none of these actions can compare to the breathtaking ease of eliminating telephonic intrusions (by commercial telemarketers, only) with the fell stroke of enlisting on the do-not-call registry, but they underscore the point that the type of injuries advanced by the FTC in support of the motion to stay are simply not irreparable and cannot be compared to the economic and first amendment injuries on the other side of the scale. Moreover, in contrast to the economic injuries posited by plaintiffs and discussed above, injuries sustained because of a wrongly-entered injunction will promptly end if and when appellate review establishes the wrongfulness of the injunction and the FTC implements the do-not-call registry.[3]

### 3. HAS THE FTC SHOWN THAT THE PUBLIC INTEREST WOULD BE HARMED WERE THE COURT TO DENY THE MOTION TO STAY THE INJUNCTION?

■ According to the FTC, the "public interest" here consists of the strong expectation on the part of "[t]ens of millions of consumers," who have already placed their names and numbers on the do-not-call registry, that this would "put a halt to the dinnertime din of unwanted telemarketing." This is recognized to be important, and nothing this court has done should be viewed as denigrating this expectation. Placing to one side the demonstrably false and patently illogical premise that prohibiting calls from only *commercial* telemarketers will "halt" unwanted calls from the other telemarketers and other mass callers exempted from regulation by the FTC, the FTC's view of the public interest is too short-sighted and ephemeral. Something more is at stake here. It is appropriate to recall words written by James Madison (characterized in countless civics books as the Father of the Constitution) in marking

---

2. Because of the impermanence and malleability of information appearing on web sites, the court has extracted the FTC's home page as it existed on September 26, 2003 and attached it to this order, for the record.

3. The court notes the United States Court of Appeals for the Tenth Circuit has ordered, in a parallel case brought by these plaintiffs against the Federal Communications Commission, "that the petition for review on the merits be expedited, and that oral argument be scheduled on the petition at the earliest practical time." *Mainstream Marketing Services, Inc. v. FCC,* Case No. 03–9571, slip op. at 3 (10th Cir. Sept. 26, 2003).

"where the public interest lies." *Hilton,* 481 U.S. at 776, 107 S.Ct. 2113.

In *Federalist No. 51,* Madison wrote:

It is of great importance in a republic not only to guard the society against the oppression of its rulers, but to guard one part of the society against the injustice of the other part. Different interests necessarily exist in different classes of citizens. If a majority be united by a common interest, the rights of the minority will be insecure.

*The Federalist Papers, No. 51,* at 323–24 (New American Library ed.1961). Freedom of speech, no matter how unpopular or disagreeable the message, is a right of every minority (including telemarketers), no matter how strong the majority's clamor for limitation or restriction. In the court's view, the public interest, rightly understood, lies in vigilantly prohibiting governmental rules which burden one type of speech, but not others, when the evil which the rule maker purports to address is as likely to be caused by the favored speech as by the burdened speech, or when the rule maker burdens one type of speech but not others because it is expedient, politically-possible, or popular to do so. The public interest, including the interest of the millions who have coalesced to join the do-not-call registry, is served in the long run by enjoining such rules if the government has not drawn the line properly. Conversely, that public interest would be harmed beyond measure were the court to acquiesce in the FTC's constricted, majoritarian view of the matter.

### 4. HAS THE FTC MADE A STRONG SHOWING THAT IT IS LIKELY TO SUCCEED ON THE MERITS OF ITS APPEAL?

The FTC concedes that the court properly chose to apply the constitutional analysis set forth in *Central Hudson* to evaluate the constitutionality of the FTC's registry under the First Amendment. Under *Central Hudson,* truthful commercial speech concerning lawful activity may be regulated if: (1) the government asserts a substantial interest in support of the regulation; (2) the government demonstrates that the restriction on commercial speech directly and materially advances that interest; and (3) the regulation is narrowly tailored. *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of N.Y.,* 447 U.S. 557, 564–565, 100 S.Ct. 2343, 2351, 65 L.Ed.2d 341 (1980); *Florida Bar v. Went For It, Inc.,* 515 U.S. 618, 624, 115 S.Ct. 2371, 2376, 132 L.Ed.2d 541 (1995). According to the FTC, although the court properly found a substantial government interest in protecting consumer privacy in the home, the court improperly evaluated whether the registry materially advances the FTC's interest in protecting this privacy. (*Id.*)

In its Order, the court found that the registry fails to materially advance the FTC's interest in consumer privacy because it only applies to commercial telemarketing calls, despite the fact that noncommercial telemarketing calls are equally invasive to consumer privacy. (Order at 22–26.) Additionally, the court found that the FTC has failed to provide a valid reason or government interest in distinguishing between commercial and noncommercial speech. Because the registry distinguishes between the indistinct, therefore, the court found it unconstitutional.

In challenging the court's analysis of whether the registry materially advances the FTC's privacy interest, the FTC first side-steps and argues that it has demonstrated a different valid interest in distinguishing between commercial and noncommercial telemarketing calls. (Def.'s Br. at 3.) Specifically, the FTC claims that it found that charitable telemarketers are less likely than commercial telemarketers

to engage in abusive telemarketing practices, such as ignoring consumers' requests to be placed on company specific do-not-call lists. (*Id.*)[4] The FTC's newly-devised justification finds no support in the evidence. The FTC claims that it came to this new conclusion based on its past experience with the company-specific do-not-call lists, which have applied to commercial telemarketers, *but not charitable and political telemarketers,* for the past eight years. (*Id.*) Because of the limited application of the company-specific requirements, *the FTC has gathered no evidence* concerning the issue of whether noncommercial telemarketers will fail to enforce company-specific do-not-call lists as those entities have been exempt from such requirements until recently. (*Id.*) The FTC's argument is not persuasive.

The FTC found that the company-specific do-not-call requirements were insufficient to protect consumer privacy. Although the company-specific requirements have applied solely to commercial telemarketers for the past eight years, the FTC cites no real evidence that it is the commercial nature of the calls which caused the company-specific requirements to fail in protecting consumer privacy. Instead, the FTC found:

> the company-specific approach is extremely burdensome to consumers, who must repeat their "do-not-call" request with every telemarketer that calls; consumers' repeated requests to be placed on a "do-not-call" list are ignored; consumers have no way to verify that their names have been taken off a company's calling list; consumers find that using

the TCPA's private right of action is very complex and time-consuming, and places an evidentiary burden on the consumer who must keep detailed lists of who called and when; and finally, even if the consumer wins a lawsuit against a company, it is difficult for the consumer to enforce the judgment.

68 Fed.Reg. at 4629 (January 29, 2003) (cited by FTC in Def.'s Br. at 3). The problems with the company-specific method create no basis upon which to distinguish between commercial and noncommercial speech in enactment of the do-not-call registry. Rather, the problems go to the nature of the company-specific method itself, as opposed to commercial telemarketers' reactions to the requirements.

Furthermore, even if the problems with the company-specific method related directly to commercial telemarketers' behavior, such problems would still not form the proper basis for distinction between commercial and noncommercial telemarketing in the registry. Basically, the FTC claims it can distinguish between commercial and noncommercial speech in the application of the registry because the FTC has no evidence from past experience that noncommercial telemarketers will behave like commercial telemarketers. Of course, the FTC has never attempted to regulate noncommercial telemarketers. The FTC's argument to advance its distinction between commercial and noncommercial speech is, therefore, a "we don't know," interest, founded on the government's own ignorance. The government body seeking to sustain a restriction on speech cannot sat-

---

**4.** The FTC now claims that it was never referring to fraud when it refers to abusive telemarketing practices, but rather the failure to comply with the company-specific do-not-call list. The FTC does, however, in both its brief and the administrative record, list fraud as one its reasons for distinguishing between commercial and noncommercial telemarket-

ing in the application of the registry. (68 Fed.Reg. 4635 (January 29, 2003); Defs.' Mot. for Summ. J. at 28 [stating that not-for-profit corporations and political fundraisers "are less likely to engage in the sorts of … deceptive acts or practices prohibited by the Telemarketing Act"].)

isfy this burden with speculation or conjecture but must demonstrate that the harm is real. *Edenfield v. Fane,* 507 U.S. 761, 770–771, 113 S.Ct. 1792, 1800, 123 L.Ed.2d 543 (1993). Here, the FTC has not demonstrated that its interest justifies a distinction between commercial and noncommercial speech; instead, it speculates that the interest does.

Additionally, the FTC's argument is circular. It asserts that, because the FTC has always made illogical distinctions based on the content of speech in its telemarketing rules, it can continue to make these distinctions. The FTC cannot bootstrap a substantial government interest from its own previous regulatory behavior to justify content-discrimination under the First Amendment. Accordingly, the FTC's interest in improving upon its company-specific do-not-call method does not justify a distinction between commercial and noncommercial telemarketing.[5]

Secondly, the FTC claims it has a likelihood of success on appeal because the court improperly analyzed *City of Cincinnati v. Discovery Network, Inc.,* 507 U.S. 410, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993). (Def.'s Br. at 4.) Specifically, the FTC claims that *Discovery Network* does not require the FTC to justify the exclusion of noncommercial speech from the registry's coverage through a reason related to the interest the registry is seeking to further. (*Id.*) According to the FTC, the court in *Discovery Network* found the regulation unconstitutional solely because of the minuscule percentage of news racks affected by the regulation in relation to the city's

asserted goal, as opposed to the content-based distinction made by the regulation. (*Id.*)

The FTC is correct that the court found the regulation at issue in *Discovery Network* unconstitutional partly because it only achieved a numerically insignificant reduction in the number of news racks in the city. *Discovery Network,* 507 U.S. at 417, 113 S.Ct. at 1510. According to the Court, therefore, the city had not materially advanced its interest in beautification. The Court, however, also noted, "[n]ot only does Cincinnati's categorical ban on commercial news racks place too much importance on the distinction between commercial and noncommercial speech, but in this case, the distinction bears no relationship *whatsoever* to the particular interests that the city has asserted." *Discovery Network,* 507 U.S. at 424, 113 S.Ct. at 1514. It further stated, "Cincinnati has not asserted an interest in preventing commercial harms ..., which is, of course, the typical reason why commercial speech can be subject to greater governmental regulation than noncommercial speech." *Id.* at 426, 113 S.Ct. at 1515. Based on *Discovery Network,* therefore, the government interest asserted must bear some relationship to the distinction between commercial and noncommercial speech. Accordingly, this court finds *Discovery Network* does not indicate that the FTC has a likelihood of success on appeal.

Third, the FTC claims that the court failed to consider how lightly the do-not-call registry restricts speech, considering that consumers themselves choose whether

---

**5.** In a footnote, the FTC argues that another reason for its distinguishing between commercial and noncommercial telemarketing is that Congress found noncommercial telemarketing to be less intrusive to privacy when enacting the TCPA. In the administrative record, however, the FTC specifically found that all telemarketing calls, whether commercial or noncommercial, are intrusive to consumer privacy. 68 Fed.Reg. at 4637. Nowhere did the FTC find that noncommercial calls are less intrusive. Because under intermediate scrutiny the court may only consider those government interests asserted by the government, *Edenfield v. Fane,* 507 U.S. at 768, 113 S.Ct. at 1798, interests asserted by Congress under the TCPA are irrelevant to the constitutionality of the FTC's amended Rules.

to sign-up for the list. (Def.'s Br. at 4.) The court, however, did consider this characteristic of the registry in its Order when evaluating it under *Rowan v. United States Post Office Dept.*, 397 U.S. 728, 90 S.Ct. 1484, 25 L.Ed.2d 736 (1970). As set forth in the Order, the FTC's actions sufficiently entangle the government in consumers' choices so as to implicate the First Amendment and require the government to demonstrate a substantial government interest for its distinction between commercial and noncommercial telemarketing. (Order at 19 [citing *United States v. Playboy Entm't Group, Inc.*, 529 U.S. 803, 812, 120 S.Ct. 1878, 1886, 146 L.Ed.2d 865 (2000) ].) The FTC's attempt to re-hash the same argument does not demonstrate a likelihood of success on appeal of the registry's constitutionality.

Finally, the FTC argues that it has a likelihood of success on appeal because the court failed to consider cases from other circuits where courts upheld content-based distinctions in the commercial speech context. (Def.'s Br. at 5–8 [citing *Missouri v. Am. Blast Fax, Inc.*, 323 F.3d 649 (8th Cir.2003); *Anderson v. Treadwell*, 294 F.3d 453 (2d Cir.2002); *Trans Union Corp. v. Fed. Trade Comm'n*, 267 F.3d 1138 (D.C.Cir.2001) ].) The cases are distinguishable and do not show the FTC has a likelihood of success on appeal.

First, in the *Anderson* case, the Second Circuit reviewed the constitutionality of a New York statute that (1) prohibited real estate solicitations in areas that the Secretary of State determined had significant problems with intense and repeated solicitations by real estate brokers, and (2) enforced a do-not-solicit list of those individuals who did not want to be disturbed by real estate brokers. *Anderson*, 294 F.3d at 453. Although the Second Circuit found the statute constitutional under the First Amendment, *Anderson* is distinguishable from this case. The government in

*Anderson* asserted an interest in privacy, as the FTC has in this case. *Anderson*, 294 F.3d at 461. However, in *Anderson* the New York Legislature had determined that real estate solicitations were a unique problem to consumer privacy, over and above other commercial solicitations, due to the phenomenon known as "blockbusting." *Id.* at 462. "Blockbusting" is a practice whereby real estate brokers engage in aggressive solicitation of homeowners by fanning racial tensions and promoting panic-selling. *Id.* at 457. The court, therefore, found that the government had a reason related to its interest to distinguish between different types of commercial speech, unlike the FTC in this case. In fact, the Second Circuit explicitly distinguished *Anderson* from *Discovery Network* on this basis and found that a distinction between types of commercial speech based on a legitimate reason is unlike a distinction between commercial and noncommercial speech for First Amendment purposes. *Id.* at 463–464. Here, the FTC has not demonstrated that commercial telemarketing calls are a unique problem over and above noncommercial telemarketing calls. Rather, the FTC has conceded just the opposite. 68 Fed.Reg. 4637. Because Anderson is distinguishable from this case, therefore, it does not show that the FTC has a likelihood of success on appeal.

Similarly, *Trans Union Corporation* is distinguishable from this case. In *Trans Union Corporation*, the District of Columbia Circuit upheld the constitutionality of a provision in the Fair Credit Reporting Act ("FCRA"), which permitted the sale of consumer reports to facilitate offers of credit or insurance but not to facilitate offers of other goods or services. *Trans Union Corp.*, 267 F.3d at 1138. The FTC in *Trans Union Corporation* asserted an interest in protecting personal financial data, while facilitating credit pursuant to the purpose of FCRA. *Id.* at 1142–1143.

The District of Columbia Circuit found that the interest in protecting personal data while facilitating credit entirely supported the distinction between offers of credit and offers of goods and services. *Id.* at 1143. Unlike in this case, therefore, the government interest supported the distinction between different types of speech. Additionally, *Trans Union Corporation* only dealt with distinctions between types of commercial speech, as opposed to commercial and noncommercial speech as in this case. Accordingly, because the *Trans Union Corporation* case is readily distinguishable from this case, it does not show that the FTC has a likelihood of success on appeal.

Finally, in the *American Blast Fax* case, the Eight Circuit upheld the constitutionality of a provision in the Telephone Consumer Protection Act ("TCPA"), which bans unsolicited, commercial facsimiles but not unsolicited, noncommercial facsimiles. *Am. Blast Fax, Inc.*, 323 F.3d at 649. The government asserted an interest in preventing unwanted facsimile advertising from shifting advertising costs to unwilling consumers and interfering with the reception of their facsimile machines. *Id.* at 654. Additionally, the government noted, as a basis for distinguishing between commercial and noncommercial speech, that Congress had found, in enacting the TCPA, that noncommercial calls are less intrusive to consumers than commercial calls because they are more expected. *Id.* at 655–656. The Eighth Circuit, deferred to this congressional finding. Here, in contrast, the court has found that the FTC has no valid reason to distinguish between commercial and noncommercial telemarketing. *See* discussion at n. 5 *supra.* The FTC cannot concoct a reason through speculation or conjecture but must demonstrate that the harm of commercial speech when compared to noncommercial speech is real. *See Edenfield*, 507 U.S. at 770–771, 113 S.Ct. at 1800.

The Seventh Circuit's analysis in *Pearson v. Edgar*, 153 F.3d 397 (7th Cir.1998) is the most persuasive case to this court in determining the FTC's likelihood of success on appeal. In *Pearson*, the Illinois Legislature passed a statute creating a do-not-solicit list prohibiting real estate brokers from soliciting homeowners who put their names on the list. *Id.* at 399. Illinois asserted an interest in protecting consumer privacy and ending "blockbusting." *Id.* at 402. Instead of accepting Illinois' conjecture that "blockbusting" was a unique problem justifying a distinction between real estate and other commercial solicitations, the court found that Illinois had demonstrated no evidence that "blockbusting" occurred with any frequency in Illinois. *Id.* The Seventh Circuit found, therefore, that the only valid interest asserted by the government to justify its content-based distinction was the concern for consumer privacy. *Id.* Because other commercial solicitations are as intrusive to consumer privacy as real estate solicitations, the court struck down the statute as unconstitutional. *Id.* at 405. Since *Pearson* is the case most analogous to the case before the court, the court finds that no authority from other circuits supports the FTC's assertion that it has a likelihood of success on appeal. Accordingly, the court holds that this factor in determining whether to grant a stay of the court's Order weighs against granting a stay.

### 5. CONCLUSION

 Two matters must be addressed before this order is filed. First, as an overall justification for its motion, the FTC relies heavily on an unpublished Order entered September 26, 2003, by the United States Court of Appeals for the Tenth Circuit in *Mainstream Marketing Services, Inc. v. FCC*, Case No. 03–9571 (10th Cir. Sept. 26, 2003). There, in a parallel case brought by these plaintiffs to review

do-not-call rules propounded by the Federal Communications Commission, the Tenth Circuit denied plaintiffs' request for a stay of the FCC's rules pending the appellate court's review on the merits. According to the FTC, the ruling controls the outcome of this case.

The court is mindful and respectful of an order entered by a panel of the court which will decide the issues presented on appeal of this case. Because the Order is apparently unpublished, however, it is not binding in the sense that a published opinion is binding. *See* 10th Cir. R. 36.3. More important, the FTC's argument overlooks the entirely different procedural posture of the two cases. It does not appear that the matter before the Tenth Circuit has been argued on the merits or even briefed. *See Mainstream Marketing Services, Inc. v. FCC*, Case No. 03–9571, slip op. at 3 (10th Cir. Sept. 26, 2003) (ordering expedited argument and briefing). In contrast, this court has had the benefit of extensive briefing and an opportunity to address the merits of the case. It has also reviewed the FTC's administrative record and factual materials submitted by the parties on cross-motions of summary judgment. It is not clear whether any administrative record is currently before the appellate court. Indeed, because the FTC has taken the lead on the issue, it is not clear whether the FCC made a separate record or relied to some extent on the FTC record. Finally, it does not appear that the parties made available to the Tenth Circuit the information available to this court on the issues of irreparable injury to plaintiffs, injury to others, and the public interest which is before this court. Because of this different procedural context, the court declines the invitation to give the appellate Order controlling effect here.

There is a second matter which the court must address before concluding this order. Citing news reports, plaintiffs suggest that the FTC is violating the September 25, 2003, Order by continuing to solicit persons to sign up for the national registry. Plaintiffs also claim that the FTC is attempting to side-step the Order by providing its registry to the FCC for implementation on October 1, 2003. The court regards the terms of its injunction and judgment as reasonably clear and specific: the FTC is prohibited from "creating and implementing" its do-not-call registry. The court assumes that the FTC is familiar with the substantial body of case law to the effect that a person enjoined cannot do indirectly through another what it is prohibited from doing directly. The FTC has appealed this court's ruling, as is its legal right, and the court will not assume, on the basis of news reports, that it will risk collateral proceedings by also trying to skirt the Order.

Upon the foregoing findings and conclusions, it is

**ORDERED** that Defendant Federal Trade Commission's Motion for an Emergency Stay Pending Appeal is hereby DENIED.