FLAUM, Chief Judge.
Plaintiffs are charities that Indiana’s Telephone Privacy Act (“the Act”) precludes from fundraising through professional telemarketers. They claim that the Act violates their First Amendment right to freedom of speech because it is content-based, underbroad, and a prior restraint on speech. The district court granted summary judgment to the State, and Plaintiffs now appeal. For the following reasons, we affirm the decision of the district court.
I. Background
In May 2001, Indiana’s governor signed into law the Indiana Telephone Privacy Act, codified at Indiana Code § 24^4.7. The Act creates a statewide do-not-call list and allows Indiana residential telephone customers to add themselves to this list. Once citizens affirmatively place their telephone numbers on the list, “telephone solicitors” cannot legally call the numbers for a “telephone sales call.” The Act defines a “telephone solicitor” as “an individual, a firm, an organization, a partnership, an association, or a corporation ... doing business in Indiana.” Ind.Code § 24-4.7-2-10. A “telephone sales call” is any call made to “solicit[]” a “sale of consumer goods or services” or a “charitable contribution,” or to “obtain[ ] information that will or may be used for the direct solicitation of a sale of consumer goods or services or an extension of credit for such purposes.” Ind.Code § 24-4.7-2-9.
The Act exempts certain calls from its purview. Most relevant to this case, the Act permits “telephone call[s] made on behalf of a charitable organization that is exempt from federal income taxation under Section 501 of the Internal Revenue Code, but only if ... [t]he telephone call is made by a volunteer or an employee of the charitable organization!, and] the telephone solicitor who makes the telephone call immediately discloses ... [his or her] true first and last name [and t]he name, address, and telephone number of the charitable organization.” Ind.Code § 24-4.7 — 1 — 1(3). The Act also exempts calls soliciting newspaper sales, if the calls are made by an employee of or volunteer for the newspaper company. Ind.Code § 24-4.7-l-l(6). Finally, the Act permits a licensed real estate agent or insurance agent to personally call registered numbers under specified circumstances. Ind. Code § 24-4.7-1-1(4) — (5). The Indiana Attorney General has also recognized an “implicit exclusion” for calls soliciting political contributions.
The State asserts that the Act was prompted by citizen complaints about tel *785 emarketers’ increasing intrusions on residential privacy. According to one witness in a state court trial concerning the Act, during a single four-hour shift over the course of a month, her telemarketing company alone could make up to 16,000 telephone calls. Many Indiana residents found the calls to be an invasion of the tranquility and privacy of their homes. The State has produced several affidavits from such residents that support this observation. The legislature believed its initial response to curb unwanted calls- — requiring citizens to tell each individual telemarketing firm to take their names off of the firm’s call list — had proven ineffective. Accordingly, it passed the Act to give homeowners a more effective method of preventing unwanted and intrusive calls. The Act became effective on January 1, 2002, approximately seven months after the governor signed it into law. Later that month, Indiana commissioned a professional survey to study the Act’s efficacy. That survey reflects that calls to numbers registered on the do-not-call list dropped from an average of 12.1 per week to an average of 1.9 per week. Nearly 98% of the residents who had registered their telephone numbers reported receiving “less” or “much less” telemarketing interruption since the Act became law. In June 2003, the survey-ers concluded that the Act had been effective in reducing the volume of unwanted calls to Indiana homes. Indeed, by May 2003, about half of Indiana’s residential lines had been registered on the state’s do-not-call list. By late 2005, another 500,000 numbers had been added.
The Plaintiffs in this case are all tax-exempt charities. They wish to use telemarketers to solicit donations for their charitable causes. They claim that the Act violates their First Amendment rights, because it prohibits them from using telemarketers to call the numbers registered on the do-not-call list. On cross motions for summary judgment, the district court found in favor of the State, and Plaintiffs now appeal.
II. Discussion

A. Standing

The first issue we must address is which portions of the Act Plaintiffs have standing to challenge. Plaintiffs claim that they may challenge the entire Act, even the provisions applicable only to commercial speakers, while the State claims that Plaintiffs may challenge only provisions that could be enforced against them. Plaintiffs’ arguments fall into two main categories: that the provisions aimed at commercial speakers show the “real purpose” of the Act, and that commercial speakers may not be treated more favorably than charitable speakers.
The “real purpose” line of argument is easier to dispose of. Plaintiffs’ argument is essentially that the exemptions in the Act for certain commercial speakers and political fundraising directly injure the Plaintiffs because they show the “true motive behind the Act, i.e. to suppress ‘reviled’ speakers vis a vis more favored speakers.” To support this argument, the Plaintiffs cite the Supreme Court’s decision in City of Cincinnati v. Discovery Network, 507 U.S. 410, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993). In that case, Cincinnati had passed a law regulating only commercial newsracks, which represented 62 of the over 1,500 newsracks on the city’s streets. Discovery Network, 507 U.S. at 418, 113 S.Ct. 1505. The Court held that the exception for non-commercial handbills in the Cincinnati ordinance bore no relationship to the city’s asserted interests in passing the regulation, and was so' broad as to render the legislation ineffective. Id. at 424-28, 113 S.Ct. 1505. Therefore, the Court held, the ordinance was an imper *786 missible means of addressing a legitimate public interest. Id. The Plaintiffs claim that this holding reflects that exceptions within an ordinance can show an impermissible “true reason” behind legislation, and any disfavored plaintiff can request that the Act be invalidated on that basis.
Discovery Network does not hold that exceptions to rules can reveal the “real purpose” of an act or that this “real purpose” can directly injure anyone. The case instead stands for the proposition that commercial speech cannot lightly be singled out as “less valuable” than other speech, and that restrictions on commercial speech, like restrictions on “core” First Amendment speech, must directly further a legitimate state interest. In this case, the Act’s restrictions do bear a direct relationship to the state’s interest in preventing unwanted phone calls. The State’s research, the validity of which Plaintiffs do not contest, shows that professional telemarketing firms’ calls apparently constituted the vast majority of unwanted phone calls that consumers were receiving. The Act has caused registered households to receive on average about 84% fewer unwanted calls, which amounts to approximately ten fewer unwanted calls per week. This is in stark contrast to the ordinance in Discovery Network, which regulated less than five percent of the newsracks that Cincinnati claimed were cluttering up its streets. Id. at 418, 113 S.Ct. 1505. Discovery Network does not create the new form of standing that the Plaintiffs advocate, and is factually distinguishable in any event.
Plaintiffs also claim that they must have standing to assert commercial speakers’ interests, because such speakers can have standing to assert non-commercial speakers’ rights in certain First Amendment challenges. See, e.g., Broadrick v. Oklahoma, 413 U.S. 601, 611, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973). The Plaintiffs claim that this case is the converse — a non-commercial speaker challenging on behalf of a commercial speaker. The Plaintiffs therefore ask us to extend the this First Amendment standing analysis to the situation before us.
Plaintiffs’ argument does not reflect the logical converse of the holdings in the cases they cite, but more importantly, the argument ignores the policy reasons behind the Court’s First Amendment standing doctrine. Commercial speakers have ample incentive to challenge the Act as it applies to them, unlike some speakers who might instead be “muted and [leave their] perceived grievances ... to fester.” Broadrick, 413 U.S. at 612, 93 S.Ct. 2908. We therefore believe that they are the appropriate people to challenge such restrictions.[1]
Plaintiffs also argue that by refusing to grant them standing in this case, we are necessarily treating commercial speakers more favorably than non-commercial speakers, which they believe is directly contrary to Supreme Court precedent. We are not persuaded by this argument. The reason that commercial speakers are allowed to assert standing for non-commercial speakers is because we presume that speech accorded greater protection will create a stronger case against regulation. See, e.g., Broadrick, 413 U.S. at 612, 93 S.Ct. 2908 (“In some cases, it has been the judgment of this Court that the possible harm to society in permitting some unprotected speech to go unpunished is outweighed by the possibility that protected speech of others may be muted ... ”). Charities, whose commercial speech enjoys *787 enhanced First Amendment protection, see Village of Schaumburg v. Citizens for a Better Environment, 444 U.S. 620, 100 S.Ct. 826, 63 L.Ed.2d 73 (1980), already possess a stronger First Amendment claim than commercial speakers. By being allowed to bring the Plaintiffs’ claim, commercial speakers would be treated the same as the Plaintiffs and no better.
Since the Plaintiffs’ arguments that they have standing to assert commercial speakers’ interests fail, we, like the district court, will address only those arguments that apply to Plaintiffs’ own speech.

B. Merits of the First Amendment Claim

The parties disagree about which method of First Amendment analysis is most appropriate in this case. The Plaintiffs argue that the Act is a content-based regulation that should be subjected to strict scrutiny. See United States v. Playboy Entm’t Group, Inc., 529 U.S. 803, 813, 120 S.Ct. 1878, 146 L.Ed.2d 865 (2000) (citing Sable Commc’ns of Cal., Inc. v. FCC, 492 U.S. 115, 126, 109 S.Ct. 2829, 106 L.Ed.2d 93 (1989)) (setting out strict scrutiny standard for content-based speech restrictions). The State advances a less traditional method of analysis based on the Supreme Court’s decisions in Rowan v. United States Postal Service, 397 U.S. 728, 90 S.Ct. 1484, 25 L.Ed.2d 736 (1970), and Hill v. Colorado, 530 U.S. 703, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000). Under the State’s theory, because of the “opt in” nature of the Act, we need only determine that the State’s interest in maintaining residential privacy for Indiana citizens outweighs the speaker’s right to communicate his or her message into private homes.
The State’s argument is primarily based on Rowan. In that case, the Supreme Court reviewed a law that allowed customers of the U.S. Postal Service to prohibit delivery of sales literature for items “which the addressee in his sole discretion believes to be erotically arousing or sexually provocative.” The Court upheld the statute, citing the need for a person to be safe from any unwanted message — even a “valid message” — in his or her own home. Because the homeowner had to take an affirmative act to prohibit mailings, the Court wrote:
[I]t seems to us that a mailer’s right to communicate must stop at the mailbox of the unreceptive addressee.... To hold less would tend to license a form of trespass and would make hardly more sense than to say that a radio or television viewer may not twist the dial to cut off an offensive or boring communication and thus bar its entering his home. Nothing in the Constitution compels us to listen to or view any unwanted communication, whatever its merit[.]
Rowan, 397 U.S. at 736-37, 90 S.Ct. 1484. The Rowan Court went on to state, “In effect, Congress has erected a wall' — or more accurately permits a citizen to erect a wall — that no advertiser may penetrate without his acquiescence.... [T]he citizen cannot be put to the burden of determining on repeated occasions whether the offending mailer has altered its material so as to make it acceptable.” Id. at 738, 90 S.Ct. 1484. Most tellingly, the Court directly held, “We therefore categorically reject the argument that a vendor has a right under the Constitution or otherwise to send unwanted material into the home of another.... [N]o one has a right to press even ‘good’ ideas on an unwilling recipient.” Id. The State argues that the do-not-call list similarly insulates people in their own homes from unwanted messages, and similarly requires residents to take affirmative steps before doing so.
Certain trial courts have found Rowan inapplicable to do-not-call lists, however. For example, when the district court of Colorado heard an early challenge to the *788 national do-not-call list in Mainstream Marketing, Inc. v. Federal Trade Commission, 283 F.Supp.2d 1151 (D.Colo.2003), rev’d, 358 F.3d 1228 (10th Cir.2004), it found that, unlike the statute in Rowan, the national do-not-call registry exempted certain callers, such as charities, from the list. This exemption, the district court believed, removed discretion from the consumer in a manner that the statute in Roivan did not and consequently increased the government’s discretion to decide which speech was prohibited. Id. (analyzing the claim as a content-based restriction of commercial speech under Central Hudson Gas & Electric Corp. v. Public Service Commission of New York, 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980)). A district court in North Dakota did not apply Rowan to North Dakota’s do-not-call list based on similar reasoning. Fraternal Order of Police v. Stenehjem, 287 F.Supp.2d 1023 (D.N.D.2003) (evaluating the case under the charitable speech standard articulated in Village of Schaumburg v. Citizens for a Better Environment, 444 U.S. 620, 100 S.Ct. 826, 63 L.Ed.2d 73 (1980)), rev’d, 431 F.3d 591 (8th Cir.2005). Neither the Eighth Circuit nor the Tenth Circuit directly addressed a Rowan argument similar to the one the State presses here. Instead, they reversed by employing more standard First Amendment analysis.
We find the State’s Rowan analogy persuasive, and choose to adopt it here. We agree with the aforementioned district courts that the Supreme Court’s reservations about a prior version of the act at issue in Rowan could be relevant to our analysis here. The act that the Rowan court upheld allowed a postal customer to block all future mailings from a sender after determining that any single mailing from the sender was “erotically arousing or sexually provocative.” A prior version of that act would have allowed the Postmaster General to review all future mailings from the sender to determine if they fell within a proscribed class of “pandering advertisements,” and override a consumer’s wishes not to receive mailings that the Postmaster determined did not fall into that category. Rowan, 397 U.S. at 732-33, 90 S.Ct. 1484. The Court distinguished the prior version from the final version, emphasizing that the final version allowed “the addressee complete and unfettered discretion in electing whether or not he desired to receive further material from a particular sender.” Id.
The Court wrote that although the act was acceptable in its final form, its first form would have been more problematic. Forcing the Postmaster to decide which of a sender’s mailings were “similar” to the ones that had prompted the addressee’s objection and to continue delivering all other mailings was “open to at least two criticisms.” Id. at 735, 90 S.Ct. 1484. The first is that it would potentially expose the addressee to future unwanted mail; the second was that it would “interpose the Postmaster General between the sender and the addressee and, at the least, create the appearance if not the substance of governmental censorship.” Id.
The Rowan Court’s discussion of legislative history of the act at issue in that ease lends a degree of support to the district courts’ view that Rowan is inapplicable whenever a resident does not have the complete discretion to block any form of unwanted communication through a given medium. We believe that this was not the Supreme Court’s intent, however. Most persuasively, in footnote 4, during the discussion of the potential problems with the old version of the act, the Rowan Court wrote,
Subsection (d) [of the version of the act that was later upheld] vests the Postmaster General with the duty to determine whether the sender has violated *789 the order. This determination was intended to be primarily a ministerial one involving an adjudication of whether the initial material was an advertisement and whether the sender mailed materials to the addressee more than 30 days after the receipt of the prohibitory order. An interpretation which requires the Postmaster General to determine whether the subsequent material was pandering and/or similar would tend to place him “astride the flow of mail.”
Id. at 735 n. 4, 90 S.Ct. 1484 (citing Lamont v. Postmaster General, 381 U.S. 301, 306, 85 S.Ct. 1493, 14 L.Ed.2d 398 (1965)).
We conclude that the Act places the Attorney General of Indiana in a “ministerial” role more analogous to that of the Postmaster General in the final legislation in Roivan than that act’s objectionable predecessor. The telephone calls that the Attorney General must allow to be placed to numbers on the do-not-call list are very well defined. For example, it involves little discretion to decide if the call was placed on behalf of a tax-exempt charity, or if the person who placed the call was a volunteer or employee of that charity. We therefore disagree with the view that Rowan is inapplicable merely because the Act imposes well-defined restrictions on precisely what protections from unwanted communication a residential phone customer may receive by opting in to the do-not-call list.[2]
We respectfully disagree with our concurring colleague that Rowan analysis has been displaced by subsequent Supreme Court authority creating frameworks for evaluating commercial and charitable speech. The Supreme Court has never disavowed Rowan. While the Court has subsequently cited the case primarily as authority for the state’s great interest in protecting residential privacy, we believe that this is because subsequent cases have not presented the appropriate venue for Rowan analysis, namely an opt-in statute that applies only to private residences in a manner that effectively protects residential privacy. Most notably, in Village of Schaumburg v. Citizens for a Better Environment, 444 U.S. 620, 100 S.Ct. 826, 63 L.Ed.2d 73 (1980), the ease that our concurring colleague would have us apply here, the Court evaluated an ordinance that would forbid certain charities from soliciting door-to-door or on public streets. The Court specifically noted that the statute was “not directed to the unique privacy interests of persons residing in their homes because it applies not only to door-to-door solicitation, but also to solicitation on public streets and public ways.” Vill. of Schaumburg, 444 U.S. at 638-39, 100 S.Ct. 826 (internal quotation marks omitted).
We agree that the Supreme Court has found that statutes are not narrowly tailored when they prohibit speech to all residences where it is feasible to allow only those house-holds who do not wish to receive the speech to opt in to privacy protection. See, e.g., Playboy Entm’t Group, Inc., 529 U.S. at 814-15, 120 S.Ct. 1878 (noting that blocking certain channels to all cable subscribers is unnecessarily restrictive, as the subscribers who did not wish to receive these channels could *790 opt out of receiving them). However, we find no evidence that the Court has determined that Rowan’s authority only extends to narrow tailoring analysis. It is indeed rare that a legislature enacts an opt-in statute that effectively yet narrowly protects residential privacy. While concluding that Rowan remains binding precedent, we recognize that it is correctly applied only in limited circumstances.
Once we have decided to apply the Rowan analysis, it would seem the case is resolved, since the Supreme Court has already made clear that citizens in their own homes have a stronger interest in being free from unwanted communication than a speaker has in speaking in a manner that invades residential privacy.[3] However, the Plaintiffs strenuously argue that the Act is underbroad and therefore prohibited under Discovery Network. We agree that if the Act was so underbroad as to fail to materially advance the State’s interest in residential privacy, Plaintiffs might prevail even under Rowan.[4] As discussed briefly in reference to standing, however, we believe that Indiana has shown that the Act’s exceptions bear a legitimate relationship to the important government purpose of protecting residential privacy.
Aside from the results of the State’s survey discussed previously, we also conclude that the Act’s legitimacy is bolstered by the Supreme Court’s holding in Hill v. Colorado, 530 U.S. 703, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000). In that case, the Court upheld a Colorado statute that criminalized knowingly approaching within eight feet of another person, without that person’s consent, “for the purpose of passing a leaflet or handbill to, displaying a sign to, or engaging in oral protest, education, or counseling with such other person ...” within designated areas surrounding health care clinics. Hill, 530 U.S. at 706, 120 S.Ct. 2480. The law was intended to protect women seeking to have an abortion from unwanted encounters with abortion protestors. The Court upheld the law, stating, “[T]he statute’s restriction seeks to protect those who enter a health care facility from the harassment ... that can accompany an unwelcome approach .... The statutory phrases, ‘oral protest, education, and counseling,’ distinguish speech activities likely to have those consequences from those that are most *791 unlikely to have those consequences.” Id. at 724, 120 S.Ct. 2480.
The Indiana legislature passed the Act in order to preserve residential privacy, which was being invaded by the sheer volume of calls inundating homes on a daily basis. This inundation could quite reasonably have been determined to occur when commercial motivation joins forces with a professional telemarketer possessing the technology and capacity to call thousands of people in a relatively short period of time. Allowing charities to place calls with only employees or volunteers, who will likely not place the large volume of calls that a professional telemarketer can place, would seem merely to reflect the legislature’s judgment of the limited intrusion the exception poses to residential privacy. It would seem anomalous to strike down a law because the legislature fostered as much speech as possible while still effectively protecting a state interest.
Furthermore, we are mindful that if an ordinance is to regulate any speech, it must be able to withstand a First Amendment challenge. To that end, it is not surprising that the Indiana Attorney General has fashioned an “implicit exception” for political speech, even if that speech comes from professional telemarketers. Political speech has long been considered the touchstone of First Amendment protection in Supreme Court jurisprudence, and courts are prone to strike down legislation that attempts to regulate it. See, e.g., Buckley v. Am. Constitutional Law Found., Inc., 525 U.S. 182, 192, 119 S.Ct. 636, 142 L.Ed.2d 599 (1999) (“But the First Amendment requires us to be vigilant ... to guard against undue hindrances to political conversations and the exchange of ideas.”); Roth v. United States, 354 U.S. 476, 484, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957) (The First Amendment “was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people.”) For example, in Meyer v. Grant, 486 U.S. 414, 108 S.Ct. 1886, 100 L.Ed.2d 425 (1988), the Supreme Court struck down a law that prohibited Colorado citizens from paying individuals to circulate petitions for ballot initiatives. The Court believed that the law “limit[ed] the number of voices who will convey appellees’ message and therefore ... limits the size of the audience that they can reach.” Id. at 422-23, 108 S.Ct. 1886.
The other exceptions in the Act similarly exclude speech from the Act’s purview that is less likely to cause invasions of privacy and more likely to create a valid First Amendment claim. Charitable speech is afforded heightened First Amendment protection, as both parties in this case acknowledge. See Vill. of Schaumburg v. Citizens for a Better Env’t, 444 U.S. 620, 100 S.Ct. 826, 63 L.Ed.2d 73 (1980). Newspapers have traditionally been a major forum for political speech and are at the heart of the historical justification for freedom of the press, and courts view with skepticism any law that could have a significantly damaging impact on the Fourth Estate. See Minneapolis Star & Tribune Co. v. Minnesota Comm’r of Revenue, 460 U.S. 575, 103 S.Ct. 1365, 75 L.Ed.2d 295 (1983) (invalidating tax on ink that imposed a significant burden on newspapers as a violation of First Amendment freedom of the press). The appellants themselves claim that the newspaper exception was added to the Act in response to the revelation that the Indianapolis Star received between 30 and 70 percent of its subscriptions and renewals from telemarketing. Real estate and insurance agents are also permitted to personally convey their commercial messages to customers under limited circumstances, because, as individuals directly communicating their own ideas, those professionals would have a stronger case for arguing prior restraint of speech. *792 Since their calls must by nature be made by one individual, their intrusions are much less likely to significantly burden residents’ privacy than the voluminous calls a telemarketing firm could make.
Because the Act sharply curtails telemarketing — the speech that was most injurious to residential privacy — while excluding speech that historically enjoys greater First Amendment protection, we are satisfied that the Act is not underbroad. Therefore, applying Rowan, we believe that the state’s interest in protecting residents’ right not to endure unwanted speech in their own homes outweighs any First Amendment interests the Plaintiffs possess.
III. Conclusion
For the foregoing reasons, we AffiRM the district court’s grant of summary judgment for the State of Indiana and its denial of the Plaintiffs’ motion for summary judgment.

. At least one group of commercial speakers has already unsuccessfully challenged the National Do Not Call List. See Mainstream Mktg. Servs., Inc. v. Fed. Trade Comm’n, 358 F.3d 1228 (10th Cir.2004).

. Although the concurrence criticizes this reasoning, we believe that concerns regarding the scope of exceptions to the statute are actually concerns about whether the statute is underbroad, and should be evaluated accordingly. As we discuss infra, we do not find the Act to be underbroad. Our reading ofRo-wan’s footnote four convinces us that the Court wished to avoid placing unbridled discretion in a government official: the Postmaster General. The Attorney General of Indiana does not have similar unbridled and potentially censorial discretion when enforcing the Act, which is why we view his role as “ministerial.”

. We acknowledge that an act that severely impinged on core First Amendment values, such as an opt-in list that allowed homeowners to block calls from only one side of a political debate, might not survive a Rowan balancing test. That is not the case before us, however, and thus we need not address when precisely Rowan’s balancing of the interests begins to tilt in favor of speakers. We are satisfied that all the communications prohibited in this case are similar to those that were outweighed by citizens' interests in residential privacy in Rowan.

. This was the case in Pearson v. Edgar, 153 F.3d 397 (7th Cir.1998). In that case, the statute in question forbade real estate agents from ''soliciting] an owner of residential property to sell or list such residential property at any time after such person or corporation has notice that such owner does not desire to sell such residential property.” Pearson, 153 F.3d at 399. Notably, this statute does not limit its ban to times when the homeowner is inside the home that he or she owns. Perhaps that is why the district court in that case found that the state had produced "no evidence ... that real estate solicitation harms or threatens to harm residential privacy.” Id. at 404. We noted in that case that the Rowan test was not applicable to such an underbroad statute, even though the statute was of an opt in nature. Id. at 404 ("Here the state, not the homeowner, has made the distinction between real estate solicitations and other solicitations without a logical privacy-based reason.” (emphasis added)). Therefore, we cannot agree with our concurring colleague that Pearson rejected the Rowan framework with respect to an opt-in statute that is not underbroad and is confined to communications aimed solely at a residence.